ESTATE OF LEWIS B. MEYER, DECEASED (THE FIRST NATIONAL BANK OF BIRMINGHAM, EXECUTOR), PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

ESTATE OF ROBERT R. MEYER, DECEASED (JOHN E. MEYER, ARTHUR M. SPIES, JR., AND THE FIRST NATIONAL BANK OF BIRMINGHAM, EXECUTORS), PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

ESTATE OF B. A. TAYLOR, DECEASED (NELL M. TAYLOR, EXECUTRIX), PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

J. E. KAVANAUGH, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 18470, 18471, 18553, 21066.   Promulgated December 13, 1950.

*Forney Johnston, Esq.*, for the petitioners.
*Frank M. Thompson, Jr., Esq.*, for the respondent.

854

## OPINION.

Disney, *Judge:* The question presented here arises from section 112 (b) (7) of the Internal Revenue Code, shown, so far as regarded necessary, in the margin.[5] After a corporate reorganization in 1929,

---

[5] SEC. 112. RECOGNITION OF GAIN OR LOSS.

(b) * * *

(7) ELECTION AS TO RECOGNITION OF GAIN IN CERTAIN CORPORATE LIQUIDATIONS.—

(A) General Rule.—In the case of property distributed in complete liquidation of a domestic corporation, if—

(i) the liquidation is made in pursuance of a plan of liquidation adopted after the date of the enactment of the Revenue Act of 1943, whether the taxable year of the corporation began on, before, or after January 1, 1944; and

(ii) the distribution is in complete cancellation or redemption of all the stock,

the corporations then formed merged in 1941 and the resulting corporation was liquidated, under the above statute, in 1944 and elections were filed by stockholders to be taxed thereunder. After determination of the deficiencies, involving the determination that the amount of taxable corporate earned surplus was (because of inclusion of $815,049.75 corporate surplus earned before the reorganization in 1929) much larger than the amount reflected in the stockholders' returns, their representatives filed, prior to filing the petitions herein, amendments to the elections, conditionally withdrawing and rescinding them to the extent that tax would exceed the amounts computed under section 115 (c) of the Internal Revenue Code, and electing to have gain on liquidation computed under the latter section (the result of which would be that assets received in liquidation would be treated as in payment in exchange for the stock).

(1) We will first consider the contention of the petitioners that their election under section 112 (b) (7) was not binding because within the text thereof "the transfer of all the property under the liquidation" did not occur within some one calendar month for a conclusion to that effect would render unnecessary consideration of other contentions made.

Liquidation of Meyer, Inc., under section 112 (b) (7), was initiated by resolution of its board of directors as shown by the minutes of the corporation's directors, dated October 20, 1944. Under date of November 1, 1944, the minutes of the stockholders of Meyer, Inc., reveal that a plan of liquidation of the corporation under section 112 (b) (7) was presented to and adopted by the stockholders.

The distribution and liquidation of the assets of Meyer, Inc., appear on the journal of the company as of October 31, 1944, and the receipt

---

and the transfer of all the property under the liquidation occurs within some one calendar month in 1944—
then in the case of each qualified electing shareholder (as defined in subparagraph (C)) gain upon the shares owned by him at the time of the adoption of the plan of liquidation shall be recognized only to the extent provided in subparagraphs (E) and (F).

\*     \*     \*     \*     \*     \*     \*

(D) Making and Filing of Elections.—The written elections referred to in subparagraph (C) must be made and filed in such manner as to be not in contravention of regulations prescribed by the Commissioner with the approval of the Secretary. The filing must be within thirty days after the adoption of the plan of liquidation, and may be by the liquidating corporation or by the shareholder.

(E) Noncorporate Shareholders.—In the case of a qualified electing shareholder other than a corporation—
(i) There must be recognized, and taxed as a dividend, so much of the gain as is not in excess of his ratable share of the earnings and profits of the corporation accumulated after February 28, 1913, such earnings and profits to be determined as of the close of the month in which the transfer in liquidation occurred under subparagraph (A) (ii), \* \* \*
(ii) There shall be recognized, and taxed as short-term or long-term capital gain, as the case may be, so much of the remainder of the gain as is not in excess of the amount by which the value of that portion of the assets received by him which consists of money, or of stock or securities acquired by the corporation after December 10, 1943, exceeds his ratable share of such earnings and profits.

of the same assets is recorded on the journal of Robert R. Meyer on November 1, 1944. The entry of October 31, 1944, is the last which appears in the journal of Meyer, Inc. Certified copies of the minutes of the meeting of the stockholders of Meyer, Inc., dated November 1, 1944, and a plan of liquidation adopted at the meeting were sent to the Commissioner with Form 966, Return of Information Under Section 148 (d) of the Internal Revenue Code, on November 28, 1944, and received in his office on December 1, 1944. Final income tax returns were filed by Meyer, Inc., on February 12, 1945, showing the corporation liquidated and dissolved on November 24, 1944, and reporting income for the period January 1, 1944 to November 24, 1944. The balance sheet attached is for the period ending November 24, 1944. Tissue receipts attached to each of the stubs in the stock records certificate book show the common date of November 22, 1944, as the time that the stock certificates of Meyer, Inc., were turned into the corporation by the stockholders, except that as to Taylor's stock in Meyer, Inc., the date on the tissue receipt is blank as to common stock, and as to one certificate of preferred stock, but as to two other preferred certificates is dated in 1929 and 1942, respectively. The date of the transfer endorsements by Taylor is "12–8–44." The date on the tissue receipts on Meyer Hotel Co. stock received by Taylor is "11–22–44."

Elections on Form 964 to treat the liquidation under the provisions of section 112 (b) (7) were filed by the the corporation's six stockholders under date of November 30, December 1 (two on this date), 2, 6 and 12, 1944. Income tax returns for 1944, in which the taxpayers reported the receipt of liquidated dividends under section 112 (b) (7) from Meyer, Inc., were filed by Robert R. Meyer on March 13, 1945, and Lewis B. Meyer and J. E. Kavanaugh on March 15, 1945.

In all of petitioners' dealings with the Commissioner until October 20, 1949, 4 days prior to the call of the Calendar upon which these cases were heard, they contended that the liquidation of Meyer, Inc., had been in compliance with section 112 (b) (7). The parties stipulate that the petitioners did not give the respondent any written or oral notice of the contention that the liquidation of Meyer, Inc., was not completed in one month, until on October 20, 1949, copies of the amendments (filed on October 31, 1949, the day of trial) were served on respondent's representatives. That fact is evidential. Their contention is that J. E. Kavanaugh and B. A. Taylor failed to send in their Meyer, Inc., stock certificates for cancellation and receive their distribution of assets (i. e., stock in Meyer Hotel Co., Inc., and as to Kavanaugh 24 shares in Patrick Henry Operating Co. and 10 shares in Farragut Operating Co.) until in December 1944. This view is based on a letter from Taylor dated December 6, 1944, to Meyer, reciting that shares of stock in Meyer, Inc., were enclosed, and Robert R. Meyer's letter to Taylor, dated December 7, 1944, returning the

certificates to Taylor for endorsement, which he had omitted, and enclosing a certificate for shares of stock in Meyer Hotel Co. in lieu of those in Meyer, Inc., also upon a letter dated December 8, 1944, from A. M. Spies as "General Auditor" to Kavanaugh, enclosing certificates for stock in Meyer Hotel Co., Patrick Henry Operating Co., and Farragut Operating Co., in lieu of his stock in Meyer, Inc., and asking him to forward his certificates for stock in Meyer, Inc., which he did by letter of December 12, 1944. It is to be noted that the letter to Taylor was from Meyer individually, on his individual stationery, and that Taylor's reply was to Meyer individually. Kavanaugh's reply was to Spies as general auditor of "Meyer Hotels, Inc." [6] The importance that the petitioners attach to these events is minimized by the fact that these individuals both had the new stock certificates in their possession in advance of the actual cancellation of the old certificates, thus indicating that it was not intended that distribution of the assets of Meyer, Inc., await receipt of the stock certificates therein. Regardless of that idea, however, the petitioners' view should not, for several reasons, be sustained. The assets going to Taylor and Kavanaugh described in the letters in December 1944 comprise approximately one-seventeenth in book value of the assets of Meyer, Inc. (a total of $99,334.80 as against total liquidated assets of $1,714,146.48 as recited in the plan of liquidation). We can not believe that it was the intent of Congress in section 112 (b) (7) of the Internal Revenue Code to require, after the benefits of that section had been invoked by election, that stock certificates completing 100 per cent of the assets be distributed within the single month. True the section requires "transfer of all the property under the liquidation" within the month and there is indication, in the letters in December 1944, and we on this particular point assume that a very small proportion had not been physically transferred to the owners thereof in that stock certificates had not been received by Kavanaugh and Taylor. However, the expression is "transfer of all the property *under the liquidation*" and it can not be doubted on this record that Meyer, Inc., was completely liquidated in November 1944. It reported income only until November 24 and the trial balance attached to its return was only up to that date. No book entries appeared after October 31, 1944. The statutory expression particularly considering the object of the section can not reasonably be said to be beyond valid interpretation in the regulations, and therein (Regulations 111, Section 29.112 (b) (7)–1 (*b*)) we find the statement that the Code requires the transfer of all property within some one calendar month in 1944:

* * * but this requirement will be considered to have been complied with if cash is set aside under arrangements for the payment, after the close of such

---

[6] None of the corporations involved in the facts before us bore such a name.

month, of unascertained or contingent liabilities and expenses, and such arrangements are made in good faith and the amount set aside is reasonable. Though it is not necessary that the corporation dissolve in the month of liquidation, it is essential that a status of liquidation exist at the time the first distribution is made under the plan and that such status continue to the date of dissolution of the corporation. A status of liquidation exists when the corporation ceases to be a going concern and its activities are merely for the purpose of winding up its affairs, paying its debts, and distributing any remaining balance to its shareholders.

Thus we see that interpretation of "transfer of all the property under the liquidation" within one month permits the statute to be considered complied with without actual transfer of all property, and that the accent is placed upon liquidation so much that it appears that if the first distribution is made during a status of liquidation which continues to the date of dissolution, the statute is construed as satisfied. It would be out of line with the regulation, in our opinion, to hold that the failure, within the calendar month, physically to deliver less than 6 per cent in book value of the distributed assets destroys the election, most particularly where mere transfer of stock certificates is involved.

Moreover, on the record before us, we are not convinced that all of the property under the liquidation was not transferred in November. On brief the petitioners agree:

If the taxpayer desires to take advantage of the section or finds that it has turned out adversely the burden is upon him to show by the facts within the audit period that the liquidation was or was not cleared in one calendar month.

We can not confine our examination merely to the letters in December. Not only did petitioners make no showing "within the audit period" but they affirmatively took the view, until practically the time of trial, that the statute had been complied with. This is wholly inconsistent with the present contention based on the December letters, and the petitioners do not even now state that the elections (sworn to on November 28, 1944) were innocently made by parties unaware that the stock had not been distributed to Taylor and Kavanaugh. We see therefore that the parties either misrepresented the facts to the Commissioner on November 28, or then considered that all property had been transferred in distribution. Their then opinion and representations in the elections are evidential here. Taken with other facts of record they indicate to us that the parties were in agreement that all property had been transferred. They intentionally and affirmatively made a record showing that the stock passed on November 22. Moreover, the record before us is not only that the last entry in the books of Meyer, Inc., was on October 31 when "the entire transaction was recorded on the Meyer Hotel Interests' Journal" according to the testimony showing distribution to Robert R. Meyer, but his individual journal according to the testimony indicates that the same assets were placed on his books on November 1, 1944, on his ledger sheet and general journal.

It thus appears that everything was distributed to Robert R. Meyer and that Kavanaugh and Taylor apparently considered him to be holding the assets for them to the extent of their interests. It was not Meyer, Inc., that wrote on December 7 to Taylor enclosing the certificate for stock in Meyer Hotel Company, Inc., but Meyer individually and it was to Meyer individually that Taylor wrote on December 6 when he sent in his stock in Meyer, Inc., without endorsement. Kavanaugh received his stock from Spies as "General Auditor," though Kavanaugh did in sending in his stock address Spies as general auditor of "Meyer Hotels, Inc.," which was no corporation involved. Though the parties, contrary to their view until almost the day of trial, have produced the December letters showing physical delivery of the stock certificates at that time, they do not show that Meyer was not acting for Taylor and Kavanaugh in this liquidation, and the record indicates that he was. We think that Kavanaugh and Taylor acquiesced in Meyer's handling of the matter and agreed, as represented by the elections, that the property was transferred in November. In this connection we note *Rockwood* v. *United States*, 38 Fed. (2d) 707, where a corporate charter had expired but corporate returns continued to be filed. A claim for refund of taxes paid contained no reference to the fact that the charter had expired but a second claim for refund set up that contention and the contention that after the expiration of the charter there was partnership. The court analyzes the situation as one in which claim is made because the former assessment was erroneous in form "although this form was one for which the directors were responsible at the time"; and concludes that there was no basis for such claim, quoting *McDonald Coal Co.* v. *Heiner*, 9 Fed. (2d) 992, affd., 16 Fed. (2d) 274, a case where a partnership held itself out to the Government as a corporation and was held taxable as a corporation. The court says:

\* \* \* They ought not in honesty and good faith to be permitted to represent themselves to be a corporation, file corporate tax returns, file copies of minutes of corporate action, certify the sale and transfer of partnership property to the corporation, and then deny the incorporation, when it suits the convenience of the incorporators. This is not the case of mistaken corporate tax return forms by a partnership; there is an actual certification to the Commissioner of Internal Revenue of corporate action, which precludes the possibility of there being any mistake. There was a voluntary and deliberate adoption of the corporate forms of action by the persons who were the partners in the co-partnership, and who became the incorporators of the plaintiff company and its only stockholders.

Here too there was "an actual certification to the Commissioner of Internal Revenue" of facts which under section 112 (b) (7) gave the parties a right to the election. It was a "voluntary and deliberate adoption" of the fact of complete transfer of property within the calendar month November 1944. After review of all of the evidence,

we conclude and hold that such property had all actually been transferred within the intendment of the statute and that the petitioners are in error in contending that the elections filed were not authorized by law.

(2) We next consider whether petitioners can revoke or amend the elections filed under section 112 (b) (7) of the Internal Revenue Code. Regulations 111, Section 29.112 (b) (7)–2 (*l*), provides that the election "cannot be withdrawn or revoked," and the respondent relies on the regulation. The gist of the petitioners' contention is (a) that the statute does not say that the election can not be revoked and that the regulation so providing is invalid, and (b) that the elections were filed in good faith on the assumption that earned surplus, recognizable and taxed to them under section 112 (b) (7)' was $79,729.86, in reliance upon the books of Meyer, Inc., and audit reports so showing, therefore they should not be bound by the inadvertent elections filed in ignorance.

(a) We will, therefore, first examine the question whether the regulation providing for non-revocability of election is invalid and the petitioners could revoke their elections as of right. The petitioners argue, in substance, that the statute was for the benefit of the taxpayer, and should not be distorted from its purpose by narrow interpretation or administration, that amendments were timely, before prejudice to the administration of the tax laws, and that the filing of amendments in 1948 to their original elections filed in 1944 was sufficient to have their taxes calculated in accordance with section 115 (c) rather than 112 (b) (7). We do not concur with the petitioners' theory. The Internal Revenue Code has several provisions wherein a taxpayer is given the privilege of electing between two methods. One of such instances is section 400 where the statute specifically states that the taxpayer may elect one of two ways to calculate his income tax. Section 402 reads as follows:

The election referred to in section 400 shall be exercised in the manner provided in regulations prescribed by the Commissioner with the approval of the Secretary. * * *

Regulations 111, Section 29.402–1, states:

An election * * * once made for the taxable year may not be revoked by an amended return or otherwise * * *.

We had occasion to apply that statute and regulation in *Henry C. Warren*, 13 T. C. 205, where we held that the petitioner's election was irrevocable and that he "may not now ask that his tax be computed under Supplement T"—permitting the standard deduction. (He had itemized his deductions on his original return.) We perceive no difference on the present issue in the statute here under consideration and the one considered in the *Warren* case, for section 112 (b) (7) (D)

provides for election "made and filed in such manner as to be not in contravention of regulations prescribed by the Commissioner," and therefore he promulgated Regulations 111, Section 29.112 (b) (7)–2 (*l*) providing that the election could be neither withdrawn nor revoked. Also in *Raymond E. Kershner*, 14 T. C. 168, the situation was the same as in the *Warren* case. We held election under section 400 to be irrevocable, following the *Warren* case.

In *Frank W. Keeler*, 12 T. C. 713, we considered a situation where the petitioner deducted from his gross income for 1942 a war loss under section 127 of the Code. In an amended return 3 years later, in his own interest, he eliminated such loss deduction. We held that to protect the system of the annual accounting period and orderly tax administration his election was binding. We cited *Champlin* v. *Commissioner*, 78 Fed. (2d) 905, to the effect that: "The general rule is that where a taxpayer has exercised an option conferred by statute he cannot retroactively and ex parte rescind his action."

*Pacific National Co.* v. *Welch*, 304 U. S. 191, is on principle applicable here. The Supreme Court held that by reporting sales under a deferred payment method the taxpayer made a binding election and could not by filing a claim for refund have the profit computed on the installment method. If allowed to change the method petitioner would have been entitled to a refund but the Court said:

* * * Change from one method to the other, as petitioner seeks, would require recomputation and readjustment of tax liability for subsequent years and impose burdensome uncertainties upon the administration of the revenue laws. It would operate to enlarge the statutory period for filing returns, section 53 (a), 26 U. S. C. A. § 53 (a) and note, to include the period allowed for recovering overpayments, section 322 (b), 26 U. S. C. A. § 322 note. There is nothing to suggest that Congress intended to permit a taxpayer, after expiration of the time within which return is to be made, to have his tax liability computed and settled according to the other method. By reporting income from the sales in question according to the deferred payment method, petitioner made an election that is binding upon it and the commissioner.

*United States* v. *Kaplan*, 304 U. S. 195, is to the same effect. In *Riley Investment Co.* v. *Commissioner*, 311 U. S. 55, the Supreme Court could "find no statutory support for the view that an amendment making the election provided for in that section (Section 114 (b) (4), I. R. C., as to percentage depletion) may be filed as of right after the expiration of the statutory period for filing the original return." In our opinion, the views expressed in the cases cited above meet and overcome the petitioners' idea that there is no administrative necessity for the Commissioner's interpretation and denial of rescission of election.

We are not convinced that the regulation of the Commissioner goes beyond the intent of Congress, in requiring the taxpayer to abide by his election. The election here involved is a choice between sec-

tions 115 (c) and 112 (b) (7). Had the taxpayers done nothing their taxes would have been computed under section 115 (c). Had they, after 30 days of inaction (from adoption of plan of liquidation) decided that they wished taxation under section 112 (b) (7) they could not have changed for section 112 (b) (7) (D) requires election within 30 days after adoption of the plan. In our view, Congress thus indicated that a change of view was not to be permitted, and at least that room was left for the interpretation given by the Commissioner, that there could be no change, after election under section 112 (b) (7). In the face of such provisions we think the regulation can not be held invalid. We hold that the petitioners could not, as a matter of right, amend or revoke the elections filed.

(b) The petitioners next argue, in substance, that they in fact made no election, for it was made in reliance upon the books of Meyer, Inc., and the audit reports of an accounting firm, showing earned surplus taxable as income to stockholders to be $79,728.86 and not $815,049.75 additional asserted by the Commissioner. In a word, reliance is placed upon the principle that an election must be with knowledge of all facts and conscious exercise of choice between two remedies. Assuming the soundness of this principle, the question is whether facts here appearing justify its application. The petitioner, to demonstrate the ignorance of facts, relies upon the stipulation that in considering the advisability of liquidating Meyer, Inc., and in making the election, Meyer and the other stockholders:

\* \* \* relied upon the earned surplus account in the amount of $79,728.86 as shown by the corporation's books and by the audit reports of Ernst & Ernst, Certificed Public Accountants. The said Meyer and his staff of office advisers were furnished with and likewise relied upon the memoranda, letters, and financial statements hereinafter identified as Exhibits 81 to 90, inclusive, said exhibits comprising all of the documentary data furnished to and relied upon by the decedent, Robert R. Meyer, and the other stockholders of Meyer, Inc. in proceeding with the liquidation of said corporation and in electing to have any gain thereon taxed to them under the provisions of Sec. 112 (b) (7).

Respondent's position is in effect that Meyer and the other stockholders having distributed the corporate accumulated earnings tax free in 1929 were not unaware, in 1944, of what they had earlier accomplished, particularly since representatives of the same accounting firm handled the accounts and their returns throughout the years; and that the taxpayers were chargeable with knowledge of all the facts, knew, and their advisers knew, that earned surplus was to be distributed in 1944, knew that earned surplus of $815,049.75 had been "buried" tax free in the reorganization effected in 1929 after much planning, and they having so known and having filed an election, petitioners can not be heard to complain.

We do not agree with the petitioners as to the effect of the above stipulation. It is merely that in electing in 1944 the stockholders

relied on the earned surplus being $79,728.86 as shown by corporate books and accountants' records, and relied upon certain memoranda, letters and financial statements, which were the only documentary data furnished to and relied on by the parties. Obviously they did so rely, but this does not eliminate, nor prove lack of, knowledge in them, of the previous corporate record, of reorganization, nontaxable, in 1929. The petitioners heatedly argue, in substance, that the respondent's representatives by such stipulation agreed that the stockholders had not knowledge of the complete facts such as to cause binding election, and are improperly contending otherwise, but we think petitioners construe the stipulation too broadly. The reference to "documentary" data carries the inference that there was no stipulation as to what other non-documentary knowledge the parties had.

L. C. Weiss, the same manager of the tax department of the same accounting firm was giving advice both previous to the transaction of 1929 and the liquidation in 1944, for on October 18, 1928, the manager of the firm's tax department at Atlanta sent to Meyer a memorandum initialed and dictated by Weiss outlining essentially the same plan which was carried out in 1929, and Weiss by repeated letters gave advice during the latter part of 1944 as to the proposed liquidation. Moreover, it appears on the face of Exhibits 81 and 85, specifically covered by the stipulation, that Meyer talked to Weiss by telephone, for Exhibit 81, letter to Weiss from Pratt, opens by referring to Weiss' "conversation with Mr. Meyer on yesterday" and closes by saying that it is his understanding that "Mr. Meyer desires to discuss this question with you also over long distance telephone on Monday." This is under date of August 5, 1944, and (Exhibit 85) Weiss, writing to Pratt on August 9, refers to his telephone conversation with Meyer. Thus, it is apparent that Meyer had or may have had information from his two discussions with Weiss, not covered by the documentary data encompassed in Exhibits 81 to 90. Moreover, Weiss was Meyer's tax adviser, who, at dates not shown, had under the testimony many conferences with Meyer, in Birmingham and other cities. In the face of the evidence before us indicating Weiss to be such adviser both on the earlier transaction and the one in 1944, and his telephone conversations with Meyer shown on exhibits referred to in the stipulation, we can not say that Meyer (who clearly was handling the propositions for all) did not recall the 1929 nontaxable and nontaxed transaction, and we can not believe that the respondent's representatives intended to or did stipulate so broadly as contended. If they had done so they would in effect have confessed the case on this crucial issue—for there is, under settled law, no election without full knowledge of the facts. We do not, in the language used, find intent to stipulate what the complete knowl-

edge of three deceased participants' facts was. We ascribe no such knowledge to Meyer and the other stockholders, but we do note that the petitioners have not by any means shown that the stockholders did not remember and have knowledge of their own proceedings in 1929. Though Meyer and Taylor were dead and Kavanaugh apparently in no condition to testify, that fact can not be here considered of weight, for it may be that if alive and able to testify examination would have developed knowledge of the 1929 reorganization. Just as we may not on the question of election impute knowledge to them, so we may not, on the other hand, assume without proof, and in the light of the evidence before us indicating the opposite possibility or probability, the ignorance petitioners impute to them. It is not easy to believe that parties not taxed in 1929 because of a careful reorganization, with Meyer having the same adviser in 1944, could in the latter year be unconscious of the previous transactions, but in any event we find no proof on the point. In this position, petitioners' basis of ignorance to destroy election, is found lacking.

We, therefore, consider it unnecessary to discuss all of the cases cited by both parties. We note, however, that in *Burke & Herbert Bank & Trust Co.*, 10 T. C. 1007, relied on by respondent, we considered arguments here advanced, that is, election without full knowledge or realization of tax consequences, and said that oversight, error of judgment, or unawareness of tax consequences does not lessen the binding character of an election. *Riley Investment Co.* v. *Commissioner, supra*, was cited. The petitioners distinguish *Burke & Herbert Bank*, saying that it does not appear that there the taxpayer at any time amended its election or sought to withdraw it, as here, further, that therein taxpayer appeared to have all the facts. We having above held that there is no right to amend or withdraw the election, the first suggestion is without weight,[7] and the second is contradicted by the fact that in the cited case the petitioner contended that the election was made without full knowledge of the facts. The petitioners do not comment upon the *Riley* case though it expresses the view that contentions of hardship and lack of actual knowledge of the right to make the election and appeal to equity, though they may be bases of appeal to Congress, are no ground for relief from statutory choice by Congress provided. Here the petitioners in effect argue that the stockholders did not know, until the respondent's holding of increased amount of earned surplus, that there was financial reason for a late

---

[7] The same contention, of no revocation as here, is used to distinguish *Estate of John H. Wheeler*, 1 T. C. 640, cited by respondent, where we said :
    \* \* \* That the tax under section 112 (b) (7) is more than petitioners expected to pay by reason of their interpretation of the provisions of that section is not a ground for declaring section 501 invalid as arbitrary and confiscatory. The petitioners elected to be taxed under section 112 (b) (7) and they can not complain if such election resulted in a greater tax than they expected to pay. \* \* \*

amending or withdrawal of their previous timely election.  The *Riley* principle is fully applicable.

The petitioners cite cases involving foreign taxes.  We find them distinguishable from the situation here.  They involve the difference between deduction and credits, for foreign taxes, where no election was originally executed as in this case.  In *Gentsch* v. *Goodyear Tire & Rubber Co.*, 151 Fed. (2d) 997, taxpayer's original return showed net loss but the Commissioner disallowed claimed losses, so that no tax liability appeared and an amended return signified desire, as the statute provided, to claim credit for foreign taxes, previously deducted. This was allowed by the court, which considered that the purpose of the statute involved was to prevent double reduction of tax liability, and pointed out that the election was not required to be in the original return.  Here a choice had definitely been elected, with knowledge that tax was payable, and the facts later presented by the Commissioner are not shown to have been unknown to the taxpayers.  In *Connor* v. *United States*, 19 Fed. Supp. 97, also, no claim of credit was filed in the original return, and the taxpayer had no knowledge at time of filing of liability for Canadian tax.  The situation differs in principle from that here involved.  In *Buckley, Inc.* v. *Commissioner*, 158 Fed. (2d) 153, no election or indication of desire for credit for foreign taxes was indicated in the return for the return was of net loss and it was not known that such taxes were due.  It was held that desire to take credit could be signified later.  We find the case not helpful here, where a required election was filed, and no showing is made of ignorance of pertinent facts.  Though the *Buckley* case holds that a taxpayer should not be held to a choice made when unaware of practical consequences the taxpayers here knew their choice had practical consequences; that is the reason it was made, and their knowledge of the extent of the consequences is not shown.  *Haggar Co.* v. *Helvering*, 308 U. S. 389, also cited by petitioners, we find of no assistance here.  It is a capital stock tax case, where value was by statute required to be disclosed in its first return, and it was held that "first return included an amended return filed within the period extended for such filing."  We find no authority in the cases cited for holding that the taxpayers here could, after duly electing under section 112 (b) (7), change their view and apply section 115 (c) because of a larger tax resulting from facts of which they are not shown to have been in ignorance, and in which facts they participated, for their tax benefit.  Indeed, we note that the taxpayers only "conditionally" withdrew and rescinded the previous election and that such rescission would be final only in case after determination of the status of the earned surplus, their tax should be higher under section 112 (b) (7) and took the view that they should be taxed on whichever base would be in their favor.  Such a view is, in effect, one that election

is not necessary at all, but that taxation should be on the basis more favorable to the taxpayer. If so, section 112 (b) (7) seems pointless, and a statute expressing such "whichever is lower" idea would have been in order. That thought is used elsewhere in the Internal Revenue Code, but not in the language here for construction. We conclude and hold that the Commissioner is not shown to have erred in the application of section 112 (b) (7), as against section 115 (c), in the computation of income.

(3) We now consider whether respondent erred in his determination of the amount of accumulated earnings and profits of Meyer, Inc., on the date of its liquidation, because of failure to determine properly the consequences tax-wise of certain transactions. These transactions, petitioners argue, had the effect of reducing the earned surplus account and increasing the adjusted basis of the stock of Meyer, Inc., regardless as to whether section 112(b) (7) or section 115(c) is applied.

(a) We first consider whether he erred in adding $815,049.75 to accumulated earnings and profits because of the declaration of dividends in that amount to Meyer, Inc., in 1929 by the six operating companies, and in not viewing the amounts as dividends paid to individual stockholders and then paid to Meyer, Inc., as capital surplus by the individual stockholders. The petitioners concede that the books of Meyer, Inc., and Commonwealth when opened sometime after July 2, 1929, purported to reflect the receipt of Meyer, Inc., of the dividends from the six operating companies. The minutes of the first directors' meeting of Meyer, Inc., bearing the date July 2, 1929, 2:30 P.M., recite and accept the offer of the individual stockholders of the seven hotel operating companies and indicate the formation of Meyer, Inc., at that particular time. The dividends of the six operating companies, according to the minutes of special meetings of the board of directors of the companies, were declared as of July 2, 1929, at 3:00 P.M. Hence, by the minutes of the directors' meetings of the companies involved, Meyer, Inc., was the logical recipient of the dividends declared by the six operating companies.

Robert R. Meyer, Lewis B. Meyer, B. A. Taylor, and J. E. Kavanaugh, individual stockholders of the operating companies, did not report any of the dividends included in the $815,049.75 in their Federal income tax returns filed for the calendar year 1929. Furthermore, Meyer, Inc., in its Federal income tax return filed for the taxable year July 2, 1929, to December 31, 1929, revealed that it had received $825,049.75 [8] dividends on stock of the domestic corporations and also deducted the same amount as "Dividends (Form Schedule H)." The return carries no explanation in "Schedule H." The return does indi-

---

[8] This is apparently an error and apparently should be the $815,049.75 herein discussed and if not, the additional $10,000 is not explained.

cate in "Schedule L—Reconciliation of Net Income & Analysis of Changes in Surplus" that it paid dividends on July 2, 1929, in the amount of $1,041,898.57. The return was filed on June 11, 1930. Prior to that time, on May 16, 1930, one of Robert R. Meyer's tax advisers wrote to Meyer, Inc., calling attention to the item of $1,041,898.57 in the return and advised that it be identified as property transferred to Commonwealth for its stock which was distributed in reorganization to the stockholders of Meyer, Inc. From this we conclude that from the viewpoint of both the individual stockholders of the operating companies and the directors and officers of Meyer, Inc., the dividends were considered as having been paid to and received by Meyer, Inc.

We are now asked by the petitioners to approve a position opposed to the one taken by the parties at the time of the transactions. Both parties (i. e., the petitioners and the respondent) now take the view that the directors of Meyer, Inc., could not have met on July 2, 1929, at 2 : 30 P. M., to form the corporation known as Meyer, Inc., that the corporation could not have been formed until sometime in August or September. The petitioners argue from this that since Meyer, Inc., was not organized until sometime during August or September, the dividends declared as of July 2, 1929, at 3 : 00 P. M., must necessarily have been payable to the individual stockholders of the operating companies. The respondent argues, on the other hand, that the directors of the operating companies could not have met on July 1, 1929, to declare the dividends payable on July 2, 1929, which, says the respondent, is substantiated by certain correspondence between the officers of the companies and their accountants, attorneys and tax advisers, further, that if these meetings took place at all, they did so about the same time as did the organizing meeting of Meyer, Inc. For this reason, respondent says that we should consider the minutes of all of the meetings and the journal entries reflecting the receipt of the dividends as they have been drawn by the officers of the respective companies and hold that the dividends were paid by the six operating companies and received by Meyer, Inc., in such a way as to reflect an inclusion of that amount in the earned surplus of Meyer, Inc.

We have examined the facts of the case with extreme care and are convinced that Robert R. Meyer and his associates did everything they could devise to reorganize the six operating companies, including the declaration of the dividends here in controversy, in such a way that the whole transaction would constitute a tax-free reorganization. In the final analysis, Meyer, Inc., did receive the dividends declared by the six operating companies and included them (without reservations or restrictions) in its plans for reorganization. There is nothing in the record to indicate that the individual stockholders of the six operating companies received any part of the dividends or were consulted about the disposition of the dividends. We having found that the

record as of July 1 and 2, 1929, was not actually then made, but was later consummated, if at all, it is apparent that there is failure of proof that the dividends were not receivable by Meyer, Inc., which actually received and reported them. The mere fact that under the record made as of July 1–2, 1929, the dividends were to go to stockholders of record at 3 : 00 o'clock P. M. of July 2, 1929, can not with reason be segregated from the fact of actual record made some time later in August or September 1929, including record of declaration of dividends and of the receipt of the dividends by Meyer, Inc. Not only is there no proof that the intent was not to declare dividends to Meyer, Inc., but that was obviously the intent, on the record as made.

The transfer of stock to Meyer, Inc., may, or may not, have been prior to the actual formulation, about August or September 1929, of the record made up. The meetings represented by the minutes written up, were either held about August–September or not at all. If not at all, the record made is the best evidence and shows the intent of the parties. If the meetings were actually held, there is no proof as to the sequence thereof, that is, whether Meyer, Inc., had before the six companies' directors declared dividends received the stock of such companies from Meyer and his associates. If Meyer, Inc., was then the stockholder, the dividends would in the absence of contract to the contrary (not shown here) belong to it, despite a record made indicating payability to stockholders as of July 2. *Lunt* v. *Genesee Valley Trust Co.*, 297 N. Y. S. 27; *Jones* v. *Terrahaute & Richmond R. R. Co.*, 57 N. Y. 196; *Smith* v. *Taecker*, 24 P. 2d 182; *Polish Am. Pub. Co.* v. *Wojcik*, 273 N. W. 771. It is not shown that Meyer, Inc., was not the owner of the stock at the actual date of declaration of dividends. Cases cited by petitioners as to declarations of dividends to be paid to stockholders as of a certain date, involve future dates, not a date in the past, as here. We are not convinced that the petitioners have proved that the respondent erred in this respect in attributing the amount of $815,049.75 to the earned surplus of Meyer, Inc.

(b) We now consider whether the sale of the Hermitage Hotel Co. stock by Robert R. Meyer to Commonwealth was an integral part of the reorganization of the respective hotel companies in such a way that the amount of $507,511.50 would constitute "boot," thereby lowering by that amount the value of the accumulated earnings and profits of Meyer, Inc., on liquidation. Petitioners contend that the credit to Robert R. Meyer's account on the books of Commonwealth of $507,511.50 was such an integral part of the over-all reorganization plan that that amount constituted "boot" taxable to Meyer under section 112 (c) of the Revenue Act of 1928. Petitioners would have us believe that the reorganization of the companies here involved included Hermitage Hotel Co. and that the part including Hermitage constituted an exchange of "stock for stock" plus "boot" in the amount

of $507,511.50. However, in our examination of the evidence of this case, we have found nothing to indicate that Robert R. Meyer received anything more than the credit on the books of Commonwealth in the amount of $507,511.50, which in due course was liquidated in full. We have found that the stock of the seven operating companies transferred to Meyer, Inc., had a value of at least $1,692,719.36 and that Meyer, Inc., issued 64,212 shares of common stock valued at $64,212 and 14,000 shares of preferred stock valued at $1,400,000 and set up capital surplus on the books of the company in the amount of $228,507.36. The total amount ascribed to the common and preferred stock and capital surplus of Meyer, Inc., was $1,692,719.36. We note that the value ascribed to the common and preferred stock and capital surplus of Meyer, Inc., was the same as the value of the seven operating companies. The organization of Commonwealth was achieved by Meyer, Inc., transferring to Commonwealth certain securities, notes and accounts receivable and capital stock of Maxwell Operating Co., valued at $1,041,898.57, for which Commonwealth issued directly to the stockholders of Meyer, Inc., 5,000 shares of common stock valued at $5,000, 3,610 shares of preferred stock valued at $361,000 and set up capital surplus on the books of the company in the amount of $675,898.57. The total amount ascribed to the common and preferred stock and capital surplus of Commonwealth was $1,041,898.57. Also in this transaction the value ascribed to the common and preferred stock and capital surplus of Commonwealth was the same as the value of the securities, notes and accounts receivable and capital stock of Maxwell Operating Co. Thus, considering the Hermitage question of "stock for stock" we do not see any place that the petitioners' theory could fit into the facts of the reorganization. Petitioners' argument that Robert R. Meyer exchanged "stock for stock" and "boot" in the amount of $507,511.50 is not borne out by the evidence.

Petitioners now take the position that Robert R. Meyer should have paid a tax on the whole amount of $507,511.50 for the year 1929 for they now argue that:

In view of the holdings of the Supreme Court in *Com'r* v. *Bedford Estate*, 325 U. S. 283, and in *Bazley* v. *Com'r*, 331 U. S. 737, there would appear to be no question that the $507,511.50 credit received by Meyer constituted a distribution to him which had the effect of a taxable dividend.

In a memorandum dictated by one of Robert R. Meyer's tax advisers, it was suggested that a holding company be organized, holding the stock of the operating companies, and that the dividends (the accumulated earnings and profits of the operating companies), which were expected to aggregate at least $800,000, be used to *purchase* from Robert R. Meyer the capital stock of the Hermitage Hotel Co. The memorandum also states that since Meyer had only paid $450,000

for his Hermitage stock, he would realize a profit of $350,000 which would have been taxed, according to the memorandum, at the rate of 12½ per cent. The petitioners to some extent rely upon this memorandum to prove that the Hermitage stock deal was an integral part of the whole plan of reorganization, but, in our view, it tends to prove that the organizers of Meyer, Inc., and Commonwealth were considering a *sale* of the Hermitage stock. We find the Hermitage transaction consistently called a sale throughout the documentation of the transactions of 1929. It is clear that Robert R. Meyer was well informed as to his tax liability, for as early as October 18, 1928, long before the due date of his 1929 return, he had before him his tax adviser's memorandum to the general effect that if he should receive an amount greater than his cost basis for his Hermitage stock, he would be liable for a capital gains tax. However, he did not include any amount in his 1929 income tax return in regard to the Hermitage stock transaction. We are not convinced that Robert R. Meyer had received $507,511.50 more than his cost basis for his Hermitage stock. His cost basis of his Hermitage stock was the same as the amount of the credit he received for the stock on the books of Commonwealth, i. e., $507,511.50. The fact that he did not report the transaction on his 1929 tax return, particularly in view of the fact that he had been considering the tax effect of the transaction, indicates that he received for his Hermitage stock the exact amount of his cost basis.

We, therefore, conclude that the respondent did not err in his determination of the amount of the accumulated earnings and profits of Meyer, Inc., on the date of liquidation with regard to the tax consequences of the sale of the Hermitage stock by Robert R. Meyer to Commonwealth. There is no indication in the evidence of this case that the sale of the Hermitage stock by Robert R. Meyer to Commonwealth was such an integral part of the reorganization as to lower the value of the accumulated earnings and profits of Meyer, Inc., on liquidation, by the amount claimed.

(c) Petitioners' next contention in regard to this point is that there was either no business purpose in the plan as a whole, or none in the transaction between Meyer, Inc., and Commonwealth, and

* * * that the entire plan as carried out fell outside the non-recognition provisions of the 1928 Act. As a consequence, the stockholders of the eight hotel companies realized a recognizable gain upon the 1929 exchanges * * *.

Our only question here is therefore, in essence, whether the two corporations, Meyer, Inc., and Commonwealth, were organized for any valid business purpose. Little will be accomplished in examining the many cases covering this subject and involving varied factual situations. The line of cases following *Gregory* v. *Helvering*, 293 U. S. 465, is entirely different from the cases here under consideration, for that line of cases considered corporations formed for some

tax avoidance scheme and shortly thereafter put to death or allowed to linger without performance of functions. The instant case is one in which two holding companies were formed, one remaining in existence from 1929 to 1941 and the other from 1929 to 1944. It is inconceivable to us that two holding companies would remain in existence for this length of time holding stock of various operating companies in addition to other securities, without some valid business purpose. The acts of Robert R. Meyer and his associates testify otherwise. Weiss in his draft of a letter to Taylor referred to the fact that the requirement that Meyer, Inc., distribute each year its earnings "makes it impossible for the corporation to expand its operations." Apparently it was not wholly without operations. The fact of holding stock by a holding company, such as Meyer, Inc., or Commonwealth, constitutes business purpose. An operating company is not required. We hold that Meyer, Inc., and Commonwealth were created for valid business purposes.

Deciding these cases as we have, makes it unnecessary to consider the respondent's contention that the petitioners should now be estopped from asserting the position they take in the petitions herein.

*Decisions will be entered under Rule 50.*