DiANDREA, INCORPORATED, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Di Andrea, Inc. v. Commissioner
Docket Nos. 13349-78, 13350-78, 13351-78, 13352-78.
United States Tax Court
T.C. Memo 1983-768; 1983 Tax Ct. Memo LEXIS 22; 47 T.C.M. (CCH) 731; T.C.M. (RIA) 83768; December 21, 1983. Robert O. Rogers, for the petitioners. Ivan A. Gomez, for the respondent. RAUM
MEMORANDUM FINDINGS OF FACT AND OPINION RAUM, Judge: The Commissioner determined the following deficiencies *23 and overassessment in these consolidated cases: Docket
Petitioner
Number
Year
Deficiency
Overassessment
DiAndrea, Inc.
13349-78
1975
$111,742.00
Arthur DiAndrea and
13350-78
1975
206,759.00
Yolanda DiAndrea
1976
133.08
1977
$4,679
Yolanda DiAndrea,
13351-78
1975
111,742.00
Transferee
Arthur DiAndrea,
13352-78
1975
111,742.00
Transferee
In an amendment to his Answer, the Commissioner requested an increase of $42,940 in the 1975 deficiency in docket No. 13350-78. [2]
This case involves the interplay of sections 337 and 333, I.R.C. 1954. The corporate petitioner transferred its property to its stockholders (the individual petitioners) who in turn transferred it to a purchaser. The stockholders had made an election to liquidate the corporation under section 333 with the understanding they, rather than the corporation, would be treated as having made the sale. The principal matters for adjudication are (1) whether, on this record, the corporation must be considered as the seller; and (2) *24 whether the nonrecognition provisions of section 337(a), which would be rendered inapplicable by section 337(c)(1)(B) if there were a section 333 liquidation, are nevertheless applicable because the section 333 election to liquidate was made under a mistake of fact and was therefore not binding upon the stockholders. FINDINGS OF FACT Petitioners Arthur DiAndrea ("petitioner" or "Arthur") and Yolanda DiAndrea ("Yolanda"), husband and wife, were residents of Delray Beach, Florida, when they filed their petitions herein. They filed their Federal income tax returns for the taxable years 1975, 1976, and 1977 with the Internal Revenue Service Center, Chamblee, Georgia. At all relevant times, the individual petitioners were officers and directors of and owned all of the outstanding stock of petitioner DiAndrea, Incorporated. [3] The individual petitioners and DiAndrea, Incorporated, will sometimes hereinafter be referred to in the aggregate simply as "petitioners". *25 DiAndrea, Incorporated ("DiAndrea" or the "corporation"), a cash basis taxpayer, was a New Jersey corporation engaged, as lessor, in the business of leasing the Palm Beach Motel and its contents ("Motel"). The Motel was located in Wildwood Crest, New Jersey. During the period in issue, DiAndrea's mailing address was 823 Palmer Road, Delray Beach, Florida, the home address of the individual petitioners. It filed its United States Corporate income tax return for its final taxable year, which ended December 15, 1975, [4] with the Internal Revenue Service Center, Chamblee, Georgia. On August 1, 1966, the individual petitioners acquired title to the Motel. [5] On April 4, 1967, they transferred title to the motel property to the corporation, which engaged in the business of operating the Motel until 1972. On January 13, 1972, the corporation agreed to lease the Motel to A & J Woolley Corporation ("Woolley"), the lease to become effective on April 15, 1972, and to terminate on January 12, 1975. *26 Also on January 13, 1972, the corporation executed an option agreement which gave Woolley the right to purchase the Motel for $695,000. Woolley paid $100,000 for the option, which was exercisable at any time on or before January 12, 1975. The option agreement provided that the $100,000 paid for the option would be applied against the $695,000 selling price, that the balance would be payable over 17 years "in equal annual installments of $35,000 * * * [plus] interest at a rate of eight (8) per cent per annum" and that Woolley would "execute and deliver a purchase money bond and mortgage, Financing Statements, Security Agreement, individual and personal Guaranty, in the amount of the unpaid balance of the sale price of Five Hundred Ninety-Six ($596,000.00) Dollars". [6] The option agreement further provided that in the event that the option was not exercised, Woolley would "forfeit the sum of $75,000.00 of the $100,000 [option cost], to [the corporation], and this agreement shall be null and void upon [the corporation's] payment of $25,000 back to [Woolley]". *27 Petitioner Arthur DiAndrea fully expected Woolley to exercise its option to purchase the Motel. Sometime prior to the expiration of the option on January 12, 1975, he discussed the tax consequences of the expected sale with his accountant Paul Trois. Trois advised Arthur that to avoid "get[ting] clobbered with taxes", he and Yolanda should dissolve DiAndrea pursuant to a section 333 election and then, in their individual capacity rather than as agents for the corporation, sell the Motel to Woolley. [7]
On February 19, 1974, petitioner requested Woolley to postpone the closing of the sale of the Motel from January 1975 to "September or October of 1975". *28 [8] Sometime in January 1975 the corporation and Woolley executed an "Extension Agreement" which postponed the date for settlement to October 5, 1975. The Agreement further provided that "[Woolley] * * * shall have been deemed to have exercised its option so that the option agreement is now an agreement for purchase", and that "[Woolley] * * * shall continue in possession, and shall pay in reduction of principal for said land and premises the sum of $35,000.00, and shall pay interest at the rate of 8 percent per annum on $595,000.00, which will be $47,600.00 for the portion of the year 1975 to October 3, 1975". The remaining balance of $560,000 was to be paid over 16 years at a rate of $35,000 per year plus interest at eight percent. The Agreement was signed for Woolley and the corporation by Albert Woolley and petitioner Arthur DiAndrea, respectively. In addition, Albert Woolley, his wife and the individual petitioners agreed separately that they would "cause our respective corporations to perform their agreements as agreed". The corporation's 1975 income tax return includes $82,600 as payments from Woolley in compliance with the Extension Agreement. [9]
*29 On September 2, 1975, DiAndrea held a "Joint Special Meeting of Stockholders and Directors" at which it was resolved to liquidate the corporation pursuant to section 333 and, "as soon as practical" after liquidation, to dissolve the corporation pursuant to state law. On September 10, 1983, the corporation executed a deed and bill of sale transferring to the individual petitioners title to the motel property and its contents. On September 15, 1975, DiAndrea filed a Form 966, Corporate Dissolution or Liquidation, and Arthur and Yolanda filed a Form 946, Election of Shareholders under Section 333 Liquidation. The Internal Revenue Service received the forms on September 19, 1975. On October 9, 1975, the individual petitioners executed a deed and bill of sale purporting to transfer title to the Motel (i.e., the motel property and its contents) to Woolley. On November 7, 1975, Woolley executed a note to the individual petitioners secured by a mortgage on the motel property. The note was in the amount of $560,000, as required by the Extension Agreement, and was payable over 16 years at the rate of $35,000 a year in 48 thrice-yearly principal installments of $11,666.66 on the 15th *30 of July, August, and September of each year. [10] Interest, computed at a rate of eight percent per annum on the unpaid balance, was to be added to the principal payments. On September 24, 1975, Arthur paid a $40,000 personal debt to Main National Bank using a check drawn on the corporation's checking account. The corporation's cash disbursements journal and shareholder loan journal treat the withdrawal as a loan. On November 21, 1975, Arthur deposited $40,000 in the corporation's checking account. [11] The cash receipts journal records this deposit as a repayment of the earlier loan. Also, the parties have stipulated that as a distribution in liquidation, DiAndrea cancelled a $12,739 loan obligation of Arthur to DiAndrea and that the cancellation should be treated as a distribution of money. *31 At all relevant times, Arthur and Yolanda had sole signature authority over DiAndrea's checking account. During November 1975, Arthur drew two checks payable to Yolanda in the total amount of $18,029.50 and during December he drew a check payable to Yolanda in the amount of $14,800 and a check payable to the First Bank and Trust of Boynton Beach (a depository for the Internal Revenue Service) in the amount of $8,000. The payments to Yolanda were originally accounted for as salary and the payment to the Boynton Bank represented taxes withheld with respect to this salary. However, in the deficiency notice in docket No. 13349-78, the Commissoner reclassified these payments as distributions with respect to stock and petitioners have agreed with this characterization. The checking account was closed on January 7, 1976, at which time its balance of $71.31 was distributed to Arthur and Yolanda. The corporation's 1975 tax return shows that it was liquidated on December 15, 1975. As of the time of its liquidation it owed $500 in travel expenses and $5,416 [12] in New Jersey income taxes. The individual petitioners paid a portion of the foregoing amounts in 1975 and the remainder in *32 1976. In their respective tax returns for the years in issue, petitioners reported their income relying on the assumptions that DiAndrea distributed all of its assets, including the Motel, pursuant to a valid section 333 liquidation and that Arthur and Yolanda sold the Motel in their individual capacity. In the deficiency notices herein, the Commissioner treated the sale of the Motel as made by the corporation and determined deficiencies accordingly. Petitioners now contend that the sale of the Motel should not be imputed to DiAndrea or, in the alternative, that their section 333 election is either invalid or revocable, with the result that section 337 would become applicable and the gain on sale realized by the corporation would be nonrecognizable. Also in issue is the Commissioner's determination that the travel and state tax expenses incurred by the corporation but paid by the individual petitioners in 1976 are not deductible by the corporation on its final tax return. [13]
*33 The individual petitioners do not contest their transferree liability in respect of any deficiency that may ultimately be approved against the corporation. OPINION The initial matter in dispute is whether the sale of the Motel is to be imputed to the corporation, rather than to its stockholders ( the individual petitioners) and whether, in the circumstances, the corporation is to be relieved of tax in respect of the gain on sale by reason of section 337, I.R.C. 1954. The answer to the latter question depends upon whether there was a binding election under section 333. We begin with consideration of who must be treated as having made the sale. We find upon the record before us, following the guidelines of Commissioner v. Court Holding Co.,324 U.S. 331 (1945), that the corporation was the seller. Not only were the negotiations for the sale conducted on behalf of the corporation, but the option to purchase was sold by the corporation to the ultimate purchase with provision that the $100,000 option price was to be applied against the total agreed upon purchase price ($695,000) for the Motel. Thereafter, even upon expiration of the option, an "Extension Agreement" *34 was executed on behalf of the corporation, explicitly stating that the purchaser was deemed to have exercised the option "so that the option agreement is now an agreement for purchase". Moreover, installments were thereafter in fact paid to the corporation in discharge of the purchaser's stated obligation to pay principal and interest, prior to the transfer of the Motel to the stockholders for retransfer to the purchaser in order to create the illusion that the sale was being made by the stockholders rather than by the corporation. In our judgment, petitioners' position here is weaker than that of the taxpayer in Court Holding Co., and we find as a fact that the sale was made by the corporate petitioner (DiAndrea, Inc.), and not by its stockholders, the individual petitioners. Although we have thus concluded that the sale must be attributed to DiAndrea, Inc., it does not necessarily follow that it is chargeable with the gain on sale. Section 337 was enacted to render such gain nonrecognizable if its conditions are satisfied. [14] One of the limiting conditions is stated in section 337(c)(1)(B) as follows: (c) Limitations.-- (1) * * * This section shall not apply to any *35 sale or exchange-- * * * (B) following the adoption of a plan of complete liquidation, if section 333 applies with respect to such liquidation. We must therefore now consider whether the stockholders' attempt to liquidate the corporation under section 333 must be given effect. An election to be governed by the provisions of section 333 is generally not subject to revocation. See sections 1.33-2(b)(1) and 1.333-5(g), Income Tax Regs. Nevertheless, we hold, for reasons set forth below, that petitioners were not bound by their election to liquidate under section 333, since the election was made on the basis of a mistake of fact, *36 and that consequently, by reason of controlling law of the Fifth Circuit, [15] they are not bound by their election to liquidate the corporation under section 333. In Meyer's Estate v. Commissioner,200 F. 2d 592 (5th Cir. 1952), revg. 15 T.C. 850 (1950), the stockholders elected to be taxed under a predecessor provision of section 333 (section 112(b)(7) of the Internal Revenue Code *37 then in effect). The election was made in reliance upon a specified amount of earned surplus appearing on the corporate books. It turned out, however, as a consequence of the Commissioner's subsequent determination in respect of the effect of a prior corporate reorganization and merger, that the corporation's earned surplus was greatly in excess of what the stockholders believed it to be at the time they made their election. As a result, if the election were binding, the stockholders would be subject to a disproportionately high tax, and they sought to avoid the consequences of the election. The Fifth Circuit noted that section 112(b)(7), the predecessor of section 333, was intended to be "remedial in nature" (p. 597), that the election was made on the basis of a "mistake of fact as to the large earned surplus figure", and that such mistake of fact "would in effect convert a remedial statute enacted to aid taxpayers into a punitive statute inflicting a disproportionately harsh tax liability upon them" (p. 597). Under our opinion in Golsen (n. 15, supra), we are bound to follow Meyer's Estate, which holds that a mistake of fact may vitiate the binding effect of an *38 election under the particular statutory provisions involved. [16]
We must then finally consider whether the stockholders' assumption that they would be treated as the sellers was a mistake of fact. We are satisfied that they were informed by their tax advisor that they would be the sellers and that they made their section 333 election on that assumption. Was this a "mistake of fact" or a "mistake of law"? The answer, we think, is to be found in United States v. Cumberland Pub. Serv. Co.,338 U.S. 451 (1950). Cumberland was a case raising the same issue as that involved in Court Holding Co., namely, whether, in the absence of any statutory provisions like section 337, the corporation, as opposed to the stockholders, was to be treated as the seller and therefore accountable for the gain realized. There was a considerable amount of similarity in the facts. In both, the corporation began *39 the negotiations for the sale, and in both, prior to the ultimate transfer to the buyer, the corporation was liquidated, its assets were distributed to the stockholders, who finally transferred the property to the buyer. In Court Holding Co. this Court found that the stockholders were merely carrying out the corporation's agreement to sell, and held that the real seller was the corporation which had to account for the gain realized on sale. 2 T.C. 531 (1943). The Court of Appeals reversed 143 F. 2d 823 (5th Cir. 1944), but the Supreme Court in turn reversed the Court of Appeals, and reinstated the result reached by this Court. 324 U.S. 331 (1945). In Cumberland, the Court of Claims held otherwise on the facts before it. 83 F. Supp. 843 (1949). The Government argued in the Supreme Court that the decision of the Court of Claims in Cumberland was inconsistent with the Supreme Court's decision in Court Holding. There were differences in the underlying subsidiary facts in the cases, particularly as to the extent to which the negotiations on behalf of the corporation had progressed and to what extent a binding arrangement *40 had been entered into by the corporation and the purchaser prior to liquidation and the transfer of the property by the stockholders to the buyer. However, the Supreme Court refused to become involved in attempting to sort out the differences and ascribe what weight, if any, should be accorded to the differences. Instead, it noted that under the statute as written either the corporation or the stockholder-distributees could be treated as the seller depending upon the facts, and it held that it was up to the trial court, "upon consideration of an entire transaction, to determine the factual category in which a particular transaction belongs". (Emphasis supplied.) (P. 456.) It concluded that "[h]ere as in the Court Holding Co. case we accept the ultimate findings of fact of the trial tribunal". (Emphasis supplied.) Cumberland thus treated the matter as one of fact, and, as a consequence, petitioners' mistake as to who would be regarded as the seller was one that should be classified as a mistake of fact, thus bringing Meyer's Estate into play. In one respect this case is even stronger for the taxpayers than Meyer's Estate. The earnings and profits account *41 (referred to as "earned surplus" in Meyer's Estate) was of critical importance in both cases. In the instant case, if the sale is to be imputed to the corporation and if section 333 were held to be applicable, section 337 would be inapplicable and the corporation's earnings and profits would be greatly increased by reason of the recognizable gain on sale of its property. Similarly, it was the unanticipatedly large increase in the earnings and profits account of the corporation that resulted in the increase in tax in Meyer's Estate, unless the election under the predecessor of section 333 were held not to be binding. The Court of Appeals in Meyer's Estate held that the election was not binding, since in its view the level of the "earned surplus" account was a question of fact and the election was made upon the mistaken belief relating to that factual situation.But the reason that the "earned surplus" account was sharply increased was that there had been a failure to give proper treatment to a prior reorganization and a prior merger in which the corporation was involved -- a matter of law, and not of fact. Here, on the other hand, the underlying factor affecting the earnings *42 and profits account was the question of who was the seller -- a question that the Supreme Court in Cumberland has treated as a factual matter. Thus, even though the level of the earnings and profits account was a factual matter, according to the Fifth Circuit in Meyer's Estate, the underlying cause of the increase in that case was one of law, i.e., the legal consequences of a reorganization and merger. In contrast, the underlying cause of the sharp increase in the corporation's earnings and profits in the instant case is itself required to be considered as a factual matter according to the Supreme Court in Cumberland.[17]
*43 In short, to the extent relevant in the present case, the question of the identity of the seller as between DiAndrea, Inc., and the stockholder-distributees is a factual question. And since the individual stockholders elected to come within section 333 on the assumption that they rather than their corporation were making the sale, their election was founded on a "mistake of fact", not a mistake of law. Thus, in accordance with our practice expressed in the Golsen case, we find that section 333 is inapplicable by reason of the controlling effect of Meyer's Estate in this Court. [18] We hold that the deficiencies must be recomputed in such manner as to relieve the corporation of any tax on the gain on sale of the Motel by reason of section 337, [19] and that the tax liabilities of the individual petitioners must be recomputed without the unintended crushing effect of section 333 upon them. *44 As a result of the conclusions reached above and in view of various concessions made by the petitioners, there remains for disposition only the minor question whether the corporation is entitled to a deduction in 1975 for that portion of travel expenses and the New Jersey taxes paid by the individual petitioners in 1976. Although it might be possible to find that they were acting on behalf of the corporation when they made the payments in question, such payments were not made in 1975, and regardless of any other possible analysis that might also preclude the deduction, it is not available to the corporation, a cash basis taxpayer, in 1975. Decisions will be entered under Rule 155.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Arthur DiAndrea and Yolanda DiAndrea, docket No. 13350-78; Yolanda DiAndrea, Transferee, docket No. 13351-78; and Arthur DiAndrea, Transferee, docket No. 13352-78.↩
2. The requested change also resulted in an overassessment for 1976 and an increase in the overassessment for 1977.↩
3. The record shows that a Judith Meccariello was the nominal owner of one share of DiAndrea's stock during 1975 but that she transferred such share to Yolanda on August 28, 1975. After such transfer, Arthur and Yolanda each owned 50 shares.↩
4. In other years, DiAndrea's taxable year ended on December 31.↩
5. Although it is stipulated that Arthur and Yolanda acquired title to the "Motel" on August 1, 1967, Arthur's testimony and the unchallenged third paragraph of petitioners' Request for Findings of Fact indicate that they acquired only "certain real property" in 1966, and that a motel was constructed on that property.↩
6. There is confusion in the record as to whether the correct amount of the balance was $596,000 or $595,000, but it would seem from most of the materials in evidence that the correct amount was $595,000, and the parties have so treated it.↩
7. It was apparently hoped that the individual petitioners could avoid the immediate tax in respect of the distribution of Woolley's installment note, which the law prior to the Installment Sales Revision Act of 1980, 94 Stat. 2247, required, see S. Rept. No. 96-1000, 96th Cong., 2d Sess. 20-21 (1980), 1980-2 C.B. 504-505, and that they could enjoy the benefits of a section 333, I.R.C. 1954↩, election as DiAndrea's earnings and profits would be sufficiently low if not charged with profit from the Motel's sale.
8. The undated minutes of a DiAndrea shareholder meeting show that a shareholders' vote authorized DiAndrea's officers to accept a proposal from Woolley "to extend the option to purchase the building for a period of one (1) year". There is no indication as to the actual date of this meeting or the date of Woolley's proposal. ↩
9. The $82,600 was paid during the months of July, August, and September, 1975. In accordance with the Extension Agreement, $47,600 consisted of interest and $35,000 represented the first year's installment of principal of the purchase price.↩
10. Woolley had already paid $35,000 (as required by the Extension Agreement) by the time it executed the note on November 7, 1975, and it was for that reason that the principal amount of the note was $560,000 rather than $595,000 (the net original purchase price after credit for the $100,000 option payment).↩
11. DiAndrea's records show the entry on November 21, 1975, a Friday, but DiAndrea's bank statement dates the deposit November 24, 1975, a Monday.↩
12. It is stipulated that DiAndrea owed $5,516 in state taxes. However, the deficiency notice in docket No. 13350-78 shows that the amount was $5,416.↩
13. The Government now concedes that payments in the aggregate amount of $948 in respect of these items were made in 1975 and that such amount is deductible by the corporation in 1975. However, it continues to contest the deductibility of the payments of the remaining amounts that were made in 1976.↩
14. the general rule set forth in sec. 337(a), as in effect for the taxable year 1975, is as follows: (a) General Rule.--If-- (1) a corporation adopts a plan of complete liquidation on or after June 22, 1954, and (2) within the 12-month period beginning on the date of the adoption of such plan, all of the assets of the corporation are distributed in complete liquidation, less assets retained to meet claims, then no gain or loss shall be recognized to such corporation from the sale or exchange by it of property within such 12-month period.↩
15. Although the case is appealable to the Eleventh Circuit, which has recently been carved out of the Fifth Circuit, the Eleventh Circuit has stated that it will follow the precedents of the Fifth Circuit that were in existence prior to the creation of the Eleventh Circuit. Bonner v. City of Prichard,661 F. 2d 1206, 1207 (11th Cir. 1981). Accordingly, to the extent that our rule in Golsen v. Commissioner,54 T.C. 742, 756-757 (1970), affd. 445 F. 2d 985 (10th Cir.), cert. denied 404 U.S. 940 (1971), would be applicable to cases appealable to the Fifth Circuit it is equally applicable to cases appealable to the Eleventh Circuit. See Simon v. Commissioner,43 T.C.M. 269↩, 271, 51 P-H Memo T.C. par. 82,008 (1982).
16. The fact that Meyer's Estate was concerned with the predecessor provision in section 112(b)(7) of the Code then in effect and that the present controversy involves section 333 of the 1954 Code is of no consequence in the application of the Golsen↩ rule.
17. We do not mean to suggest that we regard Meyer's Estate as correctly decided insofar as it treats as a mistake of fact one that is induced by an underlying mistake of law, or that such a rule would necessarily be followed in other circuits. The point is that this is what the Fifth Circuit decided and that pursuant to Golsen we think we must follow it in a case appealable within that circuit (or the Eleventh Circuit), particularly in the present case which follows afortiori from Meyer's Estate, since we have here a mistake of ultimate fact based on a mistake of underlying fact in accordance with Cumberland.↩
18. We recognize that on similar facts, Cohen v. Commissioner,63 T.C. 527 (1975), affirmed without opinion 532 F. 2d 745 (3d Cir. 1976), points in the other direction. However, there is no indication that the parties in that case ever presented to the Court for consideration the impact of the Supreme Court's opinion in Cumberland in respect of the characterization of the crucial issue relating to the section 333 election as one of fact rather than as one of law, nor did that case involve the Golsen↩ rule. 19. The record indicates that the gain on sale pursuant to section 1231 was $283,276. Also involved is a $74,000 recapture pursuant to section 1245, which would follow the same course as the gain on sale.↩