## McINTOSH v. WILKINSON.

District Court, E. D. Wisconsin. June 28, 1929.

Douglass Van Dyke, of Milwaukee, Wis., for plaintiff.

L. H. Bancroft, of Milwaukee, Wis., for defendant.

GEIGER, District Judge. The plaintiff sues to recover from the defendant, as collector of internal revenue, taxes paid, and the case is before the court upon demurrer to a complaint. The latter alleges:

"That plaintiff at all times herein mentioned, including the year 1925 and at the close thereof, was and now is the wife of Charles J. McIntosh, and at all said times lived together with him and resided, and now resides, at 221 Prospect avenue, in the city of Milwaukee, in said Eastern district of Wisconsin.

"On March 12, 1926, plaintiff and said Charles J. McIntosh filed separate federal income tax returns for the calendar year 1925, at Milwaukee, Wisconsin, with said collector. At said time plaintiff paid to said collector of internal revenue four hundred seventy-seven and 92/100 ($477.92), representing a little more than one-fourth of the income and profits taxes due on her said return, and said Charles J. McIntosh paid to said collector of internal revenue fifty-five and 22/100 dollars ($55.22), representing the entire federal income and profits taxes due on his said return.

"Separate returns were so filed by reason of advice inadvertently given to D. McK. Sinclair (the secretary, bookkeeper, and agent of plaintiff and said Charles J. McIntosh), by a deputy collector of internal revenue at Milwaukee, on March 8, 1916, as follows, to wit: Said Charles J. McIntosh during the year 1925 had sold 2,800 shares of the common capital stock of the J. I. Case Threshing Machine Company, a corporation located at Racine, Wisconsin. He had ac-

quired these shares in the year 1911 in part from the estate of his father, Charles L. McIntosh, and in part by a stock dividend, and in addition held other shares acquired at various times. Being in doubt as to the basis of determining profit or loss on said sales, he submitted the data to said D. McK. Sinclair, who consulted with said deputy collector, and was informed that no profit or loss had resulted, notwithstanding that the March 1, 1913, value of said shares greatly exceeded the sales price, and said D. McK. Sinclair so informed plaintiff and said Charles J. McIntosh, and prepared said separate returns which they executed in reliance on said advice.

"On Saturday, March 13, 1926, said Charles J. McIntosh, in a conversation with W. E. Black, an attorney at law and one of the executors and trustees of his father's estate, was informed by said W. E. Black of the change in the law permitting the use of the March 1, 1913, value as a basis of determining gain or loss, and was also informed of an investigation made by the trustees of said estate, to determine the value of said stock on said date, and then for the first time, as plaintiff is informed and so alleges, the said Charles J. McIntosh discovered that the advice of the deputy collector was erroneous, and that he had sustained a large deductible loss.

"Said Charles J. McIntosh at once consulted with plaintiff, and with her consent and approval filed a joint federal income tax return for the year 1925, including the incomes of each and taking as a deduction the loss sustained on the sale of said stock. Said joint return, a true copy of which is hereto annexed as Exhibit A and made a part hereof, was designated an 'Amended Return—Charles J. McIntosh and Anna H. McIntosh,' and, as more fully appears therefrom, was a joint return of husband and wife, and discloses no taxable income by reason of the deductible loss greatly exceeding the combined gross income. It was filed with the said collector of internal revenue at Milwaukee, on Monday, March 15, 1926, prior to the expiration of the time for filing returns for the year 1925, and was accompanied by a letter, a true copy of which is hereto annexed as Exhibit B and made a part hereof."

These statutes, regulations, and decisions of tax tribunals are asserted to bear pertinently upon the question raised by the demurrer:

Revenue Act of 1926 (26 USCA § 964(b):

"Sec. 223. * * * (b) If a husband and wife living together have an aggregate net income for the taxable year of $3,500 or over, or an aggregate gross income for such year of $5,000 or over—

"(1) Each shall make a return, or

"(2) The income of each shall be included in a single joint return, in which case the tax shall be computed on the aggregate income."

"Sec. 227 (a) (26 USCA § 967(a). Returns * * * shall be made on or before the fifteenth day of the third month following the close of the fiscal year, or, if the return is made on the basis of the calendar year, then the return shall be made on or before the fifteenth day of March. * * *"

"Sec. 1101 (26 USCA § 1245). The Commissioner, with the approval of the Secretary, shall prescribe and publish all needful rules and regulations for the enforcement of this act."

Regulation, article 401:

"* * * Where the income of each is included in a single joint return, the tax is computed on the aggregate income and all deductions and credits to which either is entitled shall be taken from such aggregate income. The husband shall include in his return the income derived from services rendered by the wife or from the sale of products of her labor if she does not file a separate return or join with him in a return setting forth her income separately. * * *".

Income tax ruling:

I. T. 1367 (C. B. I–1238). "Where husband and wife for a subsequent year, have elected to file a joint or separate returns, they may not, after the filing of such return file amended returns on the other basis."

The defendant states the question: "Whether or not, under the law, the plaintiff and her husband having once chosen to have their income tax liability determined upon a separate basis, filed *separate individual* * * * returns for the year 1925, * * * paid the tax shown to be due thereon (in whole or in part), may later, but *before the last day* allowed * * * for filing returns, recede from their former position and substitute therefor a single joint return and have their tax liability determined on a different basis." (Italics and parenthesis supplied.) The plaintiff puts it: Whether the filing of separate returns constitutes a "binding" or "irrevocable" election, precluding the filing of a joint return, subsequently, but within the time "allowed" for filing, either.

Plainly, the applicability of the statute may arise under these varying hypotheses: Either husband or wife may file a separate return, regardless of the wish or attitude of the other; each may file a separate return upon an agreed joint election, as preferable to filing a joint return; they may file a joint return upon an agreed joint election, as preferable to filing separate returns; or, probably, the husband alone may return the wife's income with his own, this, too, to be considered as an election usually upon agreement.

I presume the statute should be considered as imposing upon the husband and upon the wife, severally, the duty of paying an income tax and *in some way* making return of taxable income received by each; that is to say, the statute comprehends the incomes of each.

■ Counsel seem to agree that, concurring with the fundamental imposition upon parties who are husband and wife, the right of returning the income severally or jointly, as just above indicated, is to be treated as a grant of a right to elect or to make a choice. And, apparently, it is not denied on behalf of the defense that this right is not to be differentiated from other rights of "election" or of "choice," as they may arise under instruments like wills, contracts, or under statutes. Admittedly, in all situations, the time during which the right is exercisable is either an element of the grant or an element which may pertinently affect its exercise; inherently a right of election, when once exercised, no longer exists. Therefore, when plaintiff and her husband, on March 12th, filed separate returns, it may be said that, prima facie, it evidenced their election to exercise that one of several alternatives then open to them. The complaint, in substance, says that very thing; and I agree with the suggestion of the defense that under the statute, as in all other situations, the right of choice or of election, in a legal sense, is not exercisable back and forth, that it is not a right, of re-election as the whim, caprice, or indeed the interests of the parties, upon further reflection or calculation merely, may dictate. The question in the case, however, is not answered by these concessions, because, so it is believed, it goes further and compels consideration, upon principles of equity, of well-recognized incidents or qualifications of the doctrine of election. On the matter in hand, we are concerned in particular with those which furnish tests of the finality or the irrevocability of acts, which, when done, indicate—as the act of the plaintiff and her husband in filing separate returns indicated —an *election* to pursue that course rather than another.

■ I think it may be assumed that, if a tax statute discloses a purpose to leave an option to taxpayers which will be more favorable either to a single or associated taxpayers (husband and wife, e. g.), if exercised one way rather than another, the statute so favoring them should not be whittled or more rigidly interpreted merely because the exercise of the option one way may cut down the revenue receivable. In other words, if the right be granted, opportunity for fairly exercising it should not be cut off or disparaged, especially when ignorance, misadvice, or what would ordinarily be recognized as excusable error, have entered into its exercise. And it is deemed appropriate to recur to the early recognition given to the purpose of the federal government to bring into its tax system the means for correcting error arising through *its* wrongful exactions, or through the wrongful default or failure on the part of taxpayers:

"All governments, in all times, have found it necessary to adopt stringent measures for the collection of taxes, and to be rigid in the enforcement of them. These measures are not judicial; nor does the government resort, except in extraordinary cases, to the courts for that purpose. The revenue measures of every civilized government constitute a system which provides for its enforcement by officers commissioned for that purpose. In this country, this system for each state, or for the federal government, provides *safeguards* of its own against *mistake, injustice, or oppression,* in the administration of its revenue laws. Such appeals are allowed to specified tribunals as the lawmakers deem expedient. Such remedies, also, for recovering back taxes illegally exacted, as may seem wise, are provided. In these respects, the United States have, as was said by this court in Nichols v. United States, 7 Wall. 122 [19 L. Ed. 125], *enacted a system of corrective justice, as well as a system of taxation,* in both its customs and internal revenue branches. That system is *intended to be complete.* In the customs department it permits appeals from appraisers to other appraisers, and in proper cases to the Secretary of the Treasury; and, if dissatisfied with this highest decision of the executive department of the government, the law permits the party, on paying the money required, with a protest embodying the grounds of his objection to the tax, to sue the government through its collector, and test in the courts the validity of

the tax. So also, in the internal revenue department, the statute which we have copied allows appeals from the assessor to the Commissioner of Internal Revenue; and, if *dissatisfied with his decision,* on paying the tax the party can sue the collector; and, *if the money was wrongfully* exacted, the courts will give him relief by a judgment, which the United States pledges herself to pay." (Italics supplied.) Miller, Justice, in Cheatham v. U. S., 92 U. S. 85, 88, 23 L. Ed. 561.

If, therefore, the statute confers upon husband and wife, severally and jointly, rights which may be valuable in respect of their tax liabilities, and if it be assumed that probably the principal value rests in opportunity to reduce their several or their joint liabilities to a minimum, the legislative policy of granting that sort of favor is of no consequence. But it is of consequence that the right or rights are not only assured to them, but for a definite period or term; that is to say, the right of "election" may be exercised on the first, on any intermediate, or on the last, day of a specified period ending on March 15th. Whether they are lost or impaired by failure to exercise any of them on or before the expiration date may raise an interesting question, whose answer is not material upon the facts of the present case, unless adjudications cited by the parties, to be referred to later, are binding as in effect embodying the tax decisions and regulations which aim to fix upon every return once made by husband and wife finality and irrevocability of election under the statute.

Exhaustive citation of authority is not necessary to support the proposition that the doctrine and the principles governing election and its incidents are equitable; that is, whether questions respecting the binding force of an election arise in legal or equitable actions, the considerations which deal with finality or irrevocability are all directed to fairness and equity as an objective.

Upon this fundamental matter, it suffices to refer to text-writers and leading cases for statements of the rule governing finality of election. It has received general recognition, no matter whether the obligation or the right to elect arises with respect to properties, to remedies, or generally to alternative courses of action. These statements indicate the conditions and implications of the rule.

"Subject to the above-stated limitations, it is a well-settled rule of equity that a person bound to elect has a right to become fully informed of and to know all the facts effecting his choice, and upon which a fair and proper exercise of the power of election can depend. To this end he has a right to inquire into and ascertain all the circumstances connected with the two properties—that is, his own and the one conferred upon him, and especially their relative condition and value; and he will not be compelled to elect until he has made, or at least has had an opportunity to make, such an examination as enables him to learn the truth. It follows that where an election has been made in ignorance or under a mistake as to the real condition and value of the properties, or under a mistake as to the real nature and extent of the party's own rights, such a mistake is regarded as one of fact, rather than of law; the election itself is not binding, and a court of equitable powers will permit it to be revoked, unless the rights of third persons have intervened which would be interfered with by the revocation." Pomeroy, Equity Jurisprudence (3d Ed.) 512.

After noting the possible material alteration of this rule by statutes which, if they limit the time within which an election may be made, must be construed as denying the right of exercise after the expiration of the period, the author continues:

"It is almost impossible to separate the matter of time from other circumstances, and from the conduct of the parties, so as to arrive at any definite rule. The only question involving the element of time is, what is the period during which the continued acts of the party originally entitled to elect will become binding upon him, either as amounting to an election by conduct, or as amounting to a waiver of the right to elect? Under the purely equitable doctrine, unmodified by statute, there is as it seems, no limit in point of time to a right to elect, unless it can be shown that injury would result to third persons by delay. * * *" Section 513.

So, too, in Standard Oil Co. of Ky. v. Hawkins, 74 F. 395, 398, 33 L. R. A. 739, the Circuit Court of Appeals for this circuit, considering the right of a party to recede from an election of remedy, stated the rule:

"The question is, therefore, whether, and under what circumstances, a party may be relieved from an ill-advised election of a remedy, when the election was made in ignorance that a better remedy was permitted by the law. It is one thing whether a contract will be reformed because entered into through ignorance and mistake of the law by one party, and quite another and different thing whether one may be relieved from an improvident

election of a remedy occurring through his ignorance of possessing a better remedy. 'Election,' says Dyer, 'is the internal, free, and spontaneous separation of one thing from another, existing in the mind and will.' 3 Dyer, 281. That designed selection cannot occur if the party be ignorant of his rights. He cannot deliberately select one of two or more remedies if he know of but one to which he is entitled. Therefore it is, as stated by Kerr, that 'an election made by a party under a mistake of facts, or a misconception as to his rights, is not binding in equity. In order to constitute a valid election, the act must be done with a full knowledge of the circumstances of the case, and the right to which the person put to his election was entitled.' Kerr, Fraud & M. (An. Ed., notes by Bump) 453. Of course, the assertion by the appellant of a general claim against the bank was, in a sense, inconsistent with its assertion of right to pursue the proceeds of the drafts; and it cannot be allowed to shift its position, if the change would impose detriment, in a legal sense, upon the opposing party. It would then be estopped by its conduct. But if there be no estoppel, if no injury has resulted from the remedy pursued, to deny one the right to change position would be to say that a litigant must in the first instance, and at his peril, elect his remedy, and that he may thereafter pursue no other, although the law affords him a better one, which, through ignorance or misconception, he had failed to adopt, notwithstanding his opponent has suffered no detriment from the mistaken course pursued. We do not understand the law to justify so harsh a rule. If the appellant, in ignorance of its legal rights, believed that no other course was available than to prove its debt as a general creditor; that it had no right, because of the fraud of the bank, to retake from the receiver the proceeds of the paper tortiously obtained by the bank, the avails of which had come into possession of the receiver—and in such belief proved its claim as a general creditor, equity ought to permit the withdrawal of such claim, and the pursuit of an appropriate remedy, adequate under the circumstances, to restore its property, unless the action of the appellant has wrought a change in the position of affairs, working legal detriment, that would render it inequitable for the appellant to pursue now a different course. We understand this to be the rule established, whether the mistake may be deemed a mistake of law or a mistake of fact"—citing Pomeroy, Equity Jurisprudence, 512, and cases.

The pertinent phase of these references is that, whether an election is binding or irrevocable, the considerations are principally: (1) Whether a person having the right to elect acted through ignorance, or a misconception of his rights or the like. (2) That the ignorance or misconception, whether of a matter of fact, or of a matter which by itself may be called a "matter of law," is deemed to be of "fact." (3) Whether his election has been acted upon by another or by others who would be damaged or wronged through a recession.

Of course, in the case before us, there is no contention that the plaintiff or her husband was unaware of the right to pursue one of the several alternative courses. But the complaint, when reduced to its essentials, may be stated thus: That plaintiff and her husband, being desirous of complying, in one way or another, with the statutory obligations to make return and to pay a tax, were considering the deductibility of a large loss sustained by the husband as alleged; that, in the manner indicated, they were led to the conclusion that it was not deductible. It may be agreed that the revenue officer or agent who led them to this conclusion was not bound to advise them, nor were they bound to accept his advice. It suffices, however, that they did consult him, and that he did so advise them, as they now assert, erroneously, and *contrary to the fact* of legal deductibility. Thereupon they made separate returns. Within two days, as narrated in the complaint, they learned of the error and of the change of the law or the regulations *respecting determinations of values* (of corporate stocks) to establish legal deductibility. This fact, when thus ascertained, moved the plaintiff and her husband to file a joint return—doubtless to the end that plaintiff have the benefit of the fact in exercising the privilege of making a *joint return*—and thereby save upon her tax what the law intended she should have the right to save.

Viewing the case in this way, I think it is fair to test the matter out by the inquiry whether, if there be a statutory scheme for taxation and also for "correcting" error, there is anything which really necessitates denial of the right asserted by plaintiff to either "amend" her return or to join with her husband in making what is effective as a "substitute" for their separate returns. In view of the action of the Commissioner, we are not concerned to inquire whether the loss sustained by plaintiff's husband was or is really deductible. Opportunity to litigate

that has been denied, and, on this demurrer, deductibility is conceded; that is to say, by her complaint, plaintiff shows that on joinder with her husband, if permitted, she is subject to no, or to a diminished, tax liability. Matters urged to defeat a liberal view of the statute, for example, that "great additional labor would be required," etc., are (in varying degree) potent against the whole theory of revision, or against any comprehensive "system of corrective justice." And therefore, while it is true that "no provision is made in the statute for *changing to the other basis,* either before or after the due date, once a choice has been made" (defendant's brief), and while, as has been indicated, the statute should not be held to countenance a purely whimsical or capricious right of changing "back and forth," it is equally true that there is no disclosed legislative intent to make the *selection of a basis* of return more perilous or less vulnerable—against error, ignorance or misadvice—than is error, or the like, in "calculation," or in the subject-matter of returns made. There is nothing to indicate that the *quality* of error in the one case, which leads to making a return on one basis rather than another, is such that it should on *that* account be considered irremediable; that either the government, or the taxpayer, one or the other, is intended *conclusively* to profit or to lose, respectively, by *that* sort of error.

When, therefore, tax decisions, or even a "regulation" of the Treasury, which assert that, once a joint return or separate returns are filed, the *filing* itself and *alone* is the sole and *conclusive* evidence of statutory "election," neither can be said to accord with an intention plainly apparent, either on the face of the statute or in the trend of legislation dealing with the broad subject of correction or revision, in the interest of either taxpayer or government; and both, so it seems to me, are in defiance of principles well recognized in other situations calling for determination of finality or revocability of "elections," statutory or nonstatutory. Now, whether the statute limits the period or time within which election or choice must be made is a question far different from the *conclusiveness* of an apparent election howsoever ignorantly, mistakenly, or unadvisedly made; far different from the query whether, *within* the period, opportunity for correction may be afforded and recognized.

Buttolph v. Commissioner (C. C. A.) 29 F.(2d) 695, and Grant v. Rose (D. C.) 24 F.(2d) 115, upon their facts and judicial utterances, respectively, go no farther than to declare the period of the statute *for making returns* to be a limitation of the period of election, beyond which the latter right ceases to exist. It may be said that, as a matter of statutory interpretation, these rulings embody the implication of the statutory words. Putting it in its simplest form: If the statute prescribes that *all* returns must be made *before* March 15th, it may be well said that those made upon election between several possible—i. e., separate or joint by husband and wife—are included, and that the right of choice is likewise limited.

But, with great respect, it is suggested that upon entirely probable, though different, hypotheses of fact, this may not be so clear, nor in any event not just. Suppose, husband and wife both neglect to make *any* return within the period, and under the compulsion and the penalties of the law make belated returns. Can they still elect to make a joint return? Has the Commissioner the power to compel either a joint or separate return, depending upon which will produce the larger revenue? The queries thus arising are deemed pertinent because, as has been intimated, upon the face of the statute the right to file separate, and the right to file joint, returns are of equal dignity. Especially is this so in those of the four possible situations supra, where *agreement* between husband and wife is essential. And it is hard to conceive that out of total default there should arise the obligation to make separate returns only, or separate or joint, as *the government* may "elect."

Fundamentally, after the development of the "system" for correcting error, it is scarcely probable that in a case like the one before us the right of correction was intended to be left to *administrative discretion;* that because the statute, if silent, does not award procedural steps to be taken for receding from a misadvised course, we should ascribe to the Legislature the intent to have the government profit by error of the taxpayer. Obviously, if the right of correction is cognizable under the statute or statutes, there is no discretion to deny it, either by administrative rule applicable to all, nor by discretionary action in particular, cases.

It is my judgment that the complaint states a good case, and an order overruling the demurrer may be entered.