*Decision will be entered under Rule 50.*

ESTATE OF GEORGE STAMOS, DECEASED, EVELYN J. STAMOS, EXECUTRIX, AND EVELYN J. STAMOS, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3349–67.    Filed December 14, 1970.

*Robert E. Roache*, for the petitioners.
*J. Patrick McElroy*, for the respondent.

### OPINION

RAUM, *Judge:* The Commissioner determined deficiencies in the income tax of George and Evelyn J. Stamos (the taxpayers) in the

$$\frac{12.821}{19.075} \text{ or } 67.21\%.$$

amounts of $988.20 and $505.64 for the calendar years 1963 and 1964. Since the 1964 determination has not been contested, only the deficiency determined with respect to 1963 is before us. The sole issue remaining for decision is whether the taxpayers may revoke their prior timely election to capitalize certain interest and real property tax payments and instead deduct those payments in computing their 1963 income tax. The case was submitted under Rule 30 on a complete stipulation of facts. A summary of the facts is set forth below.

Petitioners are the Estate of George Stamos and Evelyn J. Stamos, George's wife. George and Evelyn filed a joint Federal income tax return for the calendar year 1963 with the district director of internal revenue at Jacksonville, Fla. George died on March 15, 1967, and Evelyn was appointed executrix in probate proceedings filed in Dade County, Fla.

In 1959 George agreed to purchase all the outstanding stock of General Tung Oil Corp., a Florida corporation engaged in growing tung nuts and selling tung oil produced from such nuts. The assets of the corporation consisted of 2,600 acres of land, certain improvements thereon, and various items of personal property used in the operation of the business. At the time of purchase, the corporation's only outstanding shares of stock of any type were 41,275 shares of common stock, all of which were owned jointly by Polly Carnegie and the Estate of Carter Beggs Carnegie. On December 28, 1959, George executed an agreement with Polly Carnegie, acting both individually and in her capacity "as executrix of the Estate of Carter Beggs Carnegie." Under the agreement, George agreed to pay her $283,500 for the General Tung Oil stock and also agreed to purchase for the sum of $17,000 a demand note in the principal amount of $17,500 executed by the corporation to the order of Polly Carnegie. The parties have stipulated that the total purchase price for the stock thus amounted to $300,500.

Subsequently, George, as owner of all of General Tung Oil's outstanding stock, "appointed" Evelyn Stamos, Marilyn S. Close, and himself as directors of the corporation. The directors in turn elected Evelyn president of the corporation, George vice president, and Marilyn Close secretary-treasurer. George and Evelyn lived in a house owned by General Tung Oil and devoted their full time to running the business of the corporation while George held its stock.

In January 1961, George and Polly Pence (formerly Polly Carnegie) amended their original purchase agreement to reduce the overall purchase price of the 41,375 shares by $20,000.

On August 23, 1961, Georg sold the 41,375 shares of stock to Ralph W. Cary, Jr. The 41,375 shares represented 100-percent ownership of General Tung Oil's outstanding stock. George paid $15,100

as his portion of the closing costs, which included commissions, brokers fee, and attorneys fees. The net sale price of the stock was $298,500. Subsequently the stock and/or the assets of the corporation were sold by Cary, and the corporation's books and records for the years 1959 through 1961 were lost or misplaced. The Commissioner's agents audited the corporation, and no records for the years during which George owned the stock could be found.

On their 1961 joint Federal income tax return, George and Evelyn (the taxpayers) reported a long-term capital loss of $8,958.68 on the sale of the corporation's stock [1] computed as follows:

| | | |
|---|---|---:|
| Gross sales price | | $320,000.00 |
| Less: selling expense | | 15,100.00 |
| Net amount realized on sale | | $304,900.00 |
| Less: cost or other basis | | 313,858.68 |
| Net capital loss | | 8,958.68 |

Apart from the sale of the corporation's stock, the taxpayers had no taxable income in 1961.

In 1961 George suffered a heart attack and was unable to engage in any substantial business activity during 1962. As a result, the taxpayers had no taxable income in 1962 and did not file a return for that year.

During 1963 the taxpayers owned unimproved, unproductive real property located in Dade County, Fla., which they had mortgaged as security for several loans. During 1963 the taxpayers paid interest on those loans amounting to $6,485 and real estate taxes on the property amounting to $951.93. On their 1963 joint Federal income tax return, the taxpayers elected, pursuant to section 266, I.R.C. 1954,[2] and in accordance with the regulations promulgated thereunder, to capitalize the interest and real estate taxes rather than deduct them immediately. On their return the taxpayers also reported a net long-term capital gain of $14,599 and a net short-term capital loss of $8,223.57. The latter figure was based in part upon a purported capital loss carryover of $8,958.68 which the taxpayers regarded as available to them as a result of the loss which they had reported on the sale of their General Tung Oil stock in 1961. They consequently reported net taxable capital gain in the amount of $3,187.71 (i.e., 50 percent of the excess of the net long-term capital gain over the reported net short-term capital loss). After claiming a number of

---

[1] The taxpayers reported the sale of 82,750 shares of General Tung Oil stock. However, the parties have stipulated that the number of shares sold was 41,375.

[2] SEC. 266. CARRYING CHARGES.

No deduction shall be allowed for amounts paid or accrued for such taxes and carrying charges as, under regulations prescribed by the Secretary or his delegate, are chargeable to capital account with respect to property, if the taxpayer elects, in accordance with such regulations, to treat such taxes or charges as so chargeable.

deductions and exemptions, the taxpayers reported that they had no taxable income in 1963 [3]—notwithstanding the fact that they had elected to capitalize, rather than deduct, the interest and real estate taxes on the unimproved and unproductive land.

Upon audit of the taxpayers' joint returns for the years 1961, 1963, and 1964, the Commissioner's agents questioned the loss claimed on the sale of the General Tung Oil stock in 1961, and asked the taxpayers to substantiate the adjusted basis in the stock which they had reported on their 1961 return. The taxpayers contended that George had contributed additional capital to the corporation, in excess of that required by the agreement with Polly Carnegie and the amendment thereto, and that such contributions had increased his basis in the stock. However, the taxpayers stated that because of the passage of time, George's poor health at the time of the transaction, and the unavailability of corporate and personal records, they were unable to substantiate the alleged capital contributions. During their examination of the taxpayers' returns, the Commissioner's agents also discovered that the actual net sale price of the General Tung Oil stock was $298,500 and not $320,000, as the taxpayers had reported.[4] As a result of the foregoing adjustments to the stock's basis and sale price, the Commissioner adjusted the taxpayers' taxable income in 1961 to reflect a long-term capital gain from the sale of the General Tung Oil stock in the amount of $2,450, rather than the loss which the taxpayers had reported. As a consequence of other adjustments, however, the taxpayers had no taxable income in 1961, and no deficiency was determined for that year. The taxpayers waived protest and accepted the adjustments made for 1961, with the result that there was no net capital loss to be carried over to subsequent years. Consequently, the Commissioner disallowed the capital loss carryover deduction which the taxpayers had claimed on their 1963 return and increased their taxable capital gain in 1963 from $3,187.71 to $8,034.61. Together with other adjustments made by the Commissioner [5] the upward revision in taxable capital gain increased their taxable income from a reported loss of $1.26 to taxable income of $4,855.48, which in turn resulted in a deficiency of $988.20. As a consequence of

---

[3] Their return reflected a loss of $1.26.

[4] The parties have stipulated that the reduction in the stock's sale price was due to the fact that "the purchaser paid off two notes of the corporation totaling $21,500.00." Presumably, it was concluded that the $21,500 amount had erroneously been included in the $320,000 sale price reported by the taxpayers.

[5] The Commissioner made four other adjustments. He disallowed a claimed interest deduction to the extent of $343.78 "because it has not been established that the amount [$343.78] * * * was expended for the purpose designated." He also determined that the taxpayers' taxable income was reduced by allowable deductions for charitable contributions, taxes, and medical expenses, in the aggregate amount of $333.94, which had not been claimed.

the Commissioner's determination that they had taxable income in 1963, the taxpayers claimed the right to revoke the election made in their 1963 return to capitalize interest and taxes on unimproved and unproductive land and instead deduct those payments in computing their 1963 income tax. The Commissioner denied their request and issued a statutory notice of deficiency to the taxpayers.

Section 266 provides that a taxpayer may elect, pursuant to regulations prescribed by the Secretary or his delegate, to treat certain taxes and carrying charges, which would otherwise be currently deductible, as capital expenditures. On their income tax return for 1963, the taxpayers elected to capitalize certain tax and interest payments in accordance with section 266 and the regulations promulgated thereunder. When it subsequently became apparent that the Commissioner would disallow a capital loss carryover deduction claimed on their 1963 return and thereby increase their taxable income for that year, the taxpayers attempted to revoke their election to capitalize the expenditures and instead deduct those payments in computing their taxable income for 1963.

Both section 266 and the regulations promulgated under it provide that expenditures which a taxpayer has elected to capitalize may not be deducted. See Income Tax Regs., sec. 1.266-1(a). Although neither the statute nor the regulations directly address the question whether, or under what circumstances, an election to capitalize may be revoked, the regulations do state that an election under section 266 must be made by filing a statement with the taxpayer's *original* return, Income Tax Regs., sec. 1.266-1(c)(3), and that an election to capitalize tax and interest payments made with respect to unimproved and unproductive real property is effective for the year for which it is made. Income Tax Regs., sec. 1.266-1(c)(2)(i). Moreover, it was held in *Parkland Place Co.* v. *United States*, 248 F. Supp. 974, 976-977 (N.D. Tex.), affirmed on a related issue 354 F. 2d 916 (C.A. 5) (adopting the District Court's opinion as its own), that a taxpayer was not entitled to deduct certain interest expenditures which it had previously elected to capitalize under section 266. The binding effect of a timely election under section 266 was also emphasized in *Kentucky Utilities Co.* v. *Glenn*, 394 F. 2d 631, 633-635 (C.A. 6). There the Sixth Circuit held that a taxpayer which had capitalized certain tax payments on its original return could not subsequently deduct such payments on an amended return, even though it had not filed a formal statement of election with its original return.[6] The court stated (394 F. 2d at 634):

the language of the Regulation requires the taxpayer to exercise the option granted "by filing *with the original return* a statement *for that year*" listing the

[6] Cf. Rev. Rul. 70-539, 1970-2 C.B. 70.

items he wishes to capitalize. We believe this language was designed to prohibit delay in the exercise of the option and to prohibit the withholding of any statement so as to permit the later exercise of the option.

*Parkland Place Co.*, *supra*, and *Kentucky Utilities Co.*, *supra*, are consistent with a large body of case law upholding the binding effect of elections made under other provisions of the Code. The Supreme Court's decision in *Pacific National Co.* v. *Welch*, 304 U.S. 191, is often regarded as the fundamental authority for the development of this law. There a taxpayer originally reported its profit from the sale of certain lots under the "deferred payment method," thereby subjecting its entire gain to immediate taxation. Two years later the taxpayer filed a claim for a refund on the ground that the profit should have been reported on the installment method. In rejecting the taxpayer's claim and holding his original election binding, the Supreme Court stated (304 U.S. at 194) :

Change from one method to the other, as petitioner seeks, would require recomputation and readjustment of tax liability for subsequent years and impose burdensome uncertainties upon the administration of the revenue laws. It would operate to enlarge the statutory period for filing returns, section 53(a), to include the period allowed for recovering overpayments, section 322(b). There is nothing to suggest that Congress intended to permit a taxpayer, after expiration of the time within which return is to be made, to have his tax liability computed and settled according to the other method. * * *

A like result was reached in the companion case of *United States* v. *Kaplan*, 304 U.S. 195.

Moreover, several years later in *J. E. Riley Investment Co.*, 311 U.S. 55, the Supreme Court held that even though the taxpayer there had been unaware of the law permitting him to elect percentage depletion when he filed his original return, his failure to make the election was binding. The Court stated (311 U.S. at 58–59) :

That opportunity was afforded as a matter of legislative grace; the election had to be made in the manner and in the time prescribed by Congress. The offer was liberal. But the method of its acceptance was restricted. The offer permitted an election only in an original return or in a timely amendment. An amendment for the purposes of § 114(b) (4) would be timely only if filed within the period provided by the statute for filing the original return. No other time limitation would have statutory sanction. To extend the time beyond the limits prescribed in the Act is a legislative not a judicial function.

Strong practical considerations support this position.

If petitioner's view were adopted, taxpayers with the benefit of hindsight could shift from one basis of depletion to another in light of developments subsequent to their original choice. It seems clear that Congress provided that the election must be made once and for all in the first return in order to avoid any such shifts. And to require the administrative branch to extend the time for filing on a showing of cause for delay would be to vest in it discretion which the Congress did not see fit to delegate.

Petitioner urges that this result will produce a hardship here. It stresses the fact that it had no actual knowledge of the new opportunity afforded it by § 114 (b) (4) of the 1934 Act and that equitable considerations should therefore govern. That may be the basis for an appeal to Congress in amelioration of the strictness of that section. But it is no ground for relief by the courts from the rigors of the statutory choice which Congress has provided.

The principles applied in the Supreme Court's rulings in *Pacific National Co., supra,* and *J. E. Riley Investment Co., supra,* have enjoyed widespread application. Oversight, poor judgment, ignorance of the law, misunderstanding of the law, unawareness of the tax consequences of making an election, miscalculation, and unexpected subsequent events have all been held insufficient to mitigate the binding effect of elections made under a variety of provisions of the Code. *Camiel Thorrez,* 31 T.C. 655, 668, affirmed 272 F. 2d 945 (C.A. 6); *Burke & Herbert Bank & Trust Co.,* 10 T.C. 1007, 1009. See, e.g., *Lebolt & Co. v. United States,* 67 Ct. Cl. 422; *Rose* v. *Grant,* 39 F. 2d 340 (C.A. 5); *Lamb* v. *Smith,* 183 F. 2d 938, 943 (C.A. 3); *Keeler* v. *Commissioner,* 180 F. 2d 707, 710 (C.A. 10); *Marks* v. *United States,* 98 F. 2d 564, 567 (C.A. 2) certiorari denied 305 U.S. 652; *Binder* v. *Welch,* 107 F. 2d 812 (C.A. 9); *Raymond* v. *United States,* 269 F. 2d 181, 183–184 (C.A. 6); *Boone County Coal Corp.* v. *United States,* 121 F. 2d 988 (C.A. 4); *Jacobs* v. *Commissioner,* 224 F. 2d 412, 414 (C.A. 9), affirming 21 T.C. 165; *W. A. Ireland,* 32 T.C. 994, 997–998; *Samuel Pollack,* 47 T.C. 92, 111–113, affirmed on another issue 392 F. 2d 409 (C.A. 5); *Frank T. Shull,* 30 T.C. 821, 828–830, affirmed on this issue 271 F. 2d 447 (C.A. 4); *Sylvia S. Strauss,* 33 B.T.A. 855, affirmed 87 F. 2d 1018 (C.A. 2); *Albert Vischia,* 26 T.C. 1027; *Rosenfield* v. *United States,* 156 F. Supp. 780 (E.D. Pa.), affirmed per curiam 254 F. 2d 940 (C.A. 3), certiorari denied 358 U.S. 833, *Estate of Richard R. Wilbur,* 43 T.C. 322, 329–331; *National Western Life Ins. Co.,* 54 T.C. 33, 39.

Petitioners, however, seek to distinguish *Pacific National Co., supra,* and *J. E. Riley Investment Co., supra,* on the ground that one problem which the Supreme Court envisioned in those cases, "recomputation and readjustment of tax liability for subsequent years," is not presented herein. The Commissioner's position with respect to this contention is unclear. In his answer and opening brief, the Commissioner admitted that there were no tax returns for other years which would be affected if the taxpayers were permitted to revoke their original election. On the other hand, in his reply brief, the Commissioner stated that "the attempted revocation of the election *may* affect a future year if the property is sold, notwithstanding the fact that respondent's answer admitted that no returns *will* be affected, since said return might not yet be filed and since it is not clear that such return will definitely be affected."

We think it unnecessary to decide whether subsequent returns "will"

or "may" be affected. The readjustment of tax liability for subsequent years was only one of the reasons given by the Supreme Court in support of its decisions. Even where only 1 taxable year is affected by revocation of an election, the "burdensome uncertainties upon the administration of the revenue laws" contemplated by the Court may remain. We think, therefore, that the distinction urged by petitioners does not in itself remove this case from the thrust of *Pacific National* and *J. E. Riley*.

Petitioners urge that since the taxpayer's initial election was based upon a material mistake of fact, they should not be bound by it. They contend that the taxpayers' election to capitalize the tax and interest payments in 1963 was based upon their assumption that a capital loss carryover deduction was available to them which would have left them with no taxable income for that year—without deducting the interest and tax payments now in question. As a result, petitioners argue, the taxpayers had no meaningful election to make, since immediate deduction of the tax and interest payments would have left the taxpayers with an excess of deductions which could not have benefited them currently or in the future. See sec. 172(d)(4), I.R.C. 1954;[7] cf. *National Western Life Ins. Co.*, 54 T.C. 33, 39. Petitioners rely on *Meyer's Estate* v. *Commissioner*, 200 F. 2d 592 (C.A. 5), reversing 15 T.C. 850. There the stockholders of a corporation elected to have their gain on liquidation of the corporation taxed in the "alternate manner" provided by section 112(b)(7), I.R.C. 1939,[8] rather than taxed immediately at capital gain rates. The election was made in good faith reliance on an erroneous earned surplus figure reported on the corporation's books. When the Commissioner determined that the corporation's actual earned surplus was nearly $1 million greater than the figure reported on the corporation's books, the stockholders attempted to revoke their original election and elect instead to have their gain taxed at capital gain rates. The Court of Appeals granted the stockholders' request on the ground that the initial election had been made on the basis of a material mistake of fact, i.e., the erroneous earned surplus figure.

We think that petitioners' reliance on *Meyer's Estate* is misplaced.

---

[7] Sec. 172(d)(4) provides that for purposes of computing a net operating loss, in the case of a noncorporate taxpayer, "the deductions allowable by this chapter which are not attributable to a taxpayer's trade or business shall be allowed only to the extent of the amount of the gross income not derived from such trade or business."

[8] "2. Insofar as here applicable Section 112(b)(7) provided for the current taxation of gain on a corporate liquidation as ordinary income to the extent of each stockholder's pro rata share of the accumulated earnings and profits (i.e. earned surplus) of the corporation at the time of liquidation, and permitted the postponement of tax upon any gain resulting from the liquidation to the extent of the corporate assets received by the stockholders which were not represented by accumulated earnings and profits (including any part of the gain referable to appreciation in value of the corporate assets distributed) until the distributed property should be subsequently disposed of by the stockholders." *Meyer's Estate* v. *Commissioner*, 200 F. 2d at 594 fn. 2.

The record simply does not support their assertion that the taxpayers' election here was made in reliance upon a material mistake of fact. *Meyer's Estate* has often been distinguished on the ground that the taxpayers there made a material mistake of fact, and not a mistake of law. See, e.g., *Raymond* v. *United States*, 269 F. 2d 181 (C.A. 6) ; *Estate of E. P. Lamberth*, 31 T.C. 302, 312–314; *Frank T. Shull*, 30 T.C. 821, 829, affirmed 271 F. 2d 447 (C.A. 4) ; *Louis Pizitz Dry Goods Co.* v. *Deal*, 112 F. Supp. 184, 187 (N.D. Ala.), affirmed 208 F. 2d 724 (C.A. 5) ; cf. *House-O-Lite Corp.*, 24 T.C. 720, 722. Other decisions holding elections to be irrevocable have expressly noted that it had not been established that the election in issue had been based upon a material mistake of fact. See, e.g., *Kentucky Utilities Co.* v. *Glenn*, 394 F. 2d 631, 635 (C.A. 6) ; *Estate of Richard R. Wilbur*, 43 T.C. 322, 329; *Burke & Herbert Bank & Trust Co.*, 10 T.C. 1007, 1008–1009. See also *Lamb* v. *Smith*, 183 F. 2d 938, 943 (C.A. 3).

Here the taxpayers capitalized their tax and interest payments apparently because they thought that, as the result of a "loss" which they had sustained in 1961 on the sale of stock and the capital loss carryover deduction which the "loss" had generated, current deduction of the tax and interest payments would not be of value to them. The 1961 "loss" was disallowed, because the taxpayers could not establish the basis in the stock which they had reported when they claimed the loss in 1961. However, petitioners have utterly failed to explain the taxpayers' inability to establish the basis which they had originally reported. The explanation may be a mistake of law, a mistake of fact, or something quite different. Indeed, the parties' stipulation of facts suggests that in reporting the basis, the taxpayers made no mistake at all. It provides:

Respondent's agents requested * * * [the taxpayers] to submit some evidence to substantiate the adjusted basis in the stock as shown on the return. * * * [The taxpayers] contended that Mr. Stamos contributed additional capital to the corporation which increased his basis in the stock. However, * * * [the taxpayers] were unable to produce any substantiating data with respect to the alleged capital contributions. * * * [The taxpayers] stated that due to the passage of time, conditions of health of the taxpayer (Mr. Stamos) at the time of the transaction, and the unavailability of corporation and personal records, * * * [the taxpayers] were unable to substantiate the [increase in] basis of the stock * * *

In any event, there is insufficient evidence to support a finding that the election was based upon a material mistake of fact. The burden of proof is on the petitioners, and they have failed to carry it.[9]

---

[9] There is some indication that the "equitable doctrine of election" helped to foster the proposition that an election under the Code is not binding if made on the basis of a material mistake of fact. Compare *Lucas* v. *Sterling Oil & Gas Co.*, 62 F. 2d 951, 952 (C.A. 6), with *McIntosh* v. *Wilkinson*, 36 F. 2d 807 (E.D. Wis.). It is altogether unclear to us whether that doctrine is necessarily applicable to elections made under the Internal Revenue Code. In any event, in view of our disposition of this case, we need not reach that question.

*Meyer's Estate, supra*, is distinguishable from the case presented on still other grounds. There the mistake of fact made by the taxpayers related to the earnings and profits of the liquidating corporation. Under the terms of section 112(b)(7), I.R.C. 1939, the Code provision authorizing the taxpayers' election in that case, the amount of earnings and profits of the liquidating corporation was inextricably involved in the subject matter of the taxpayers' election. Here, on the other hand, the taxpayers' alleged mistake did not relate to any operative term under section 266 and the regulations, or to the objects of the election: the tax and interest payments. The taxpayers' alleged mistake related to the overall tax consequences of their election, and not directly to the election itself. The alleged mistake here involved the determination of gain or loss upon the 1961 sale of certain stock— a matter having no connection whatever with the capitalization or expensing of 1963 carrying charges in respect of some unproductive real estate. We think that such a mistake of fact, if any, is too remote from the election to be considered "material" as that term was used in *Meyer's Estate*. In making an election under the Code, a taxpayer may take into account a variety of factors which influence his overall financial condition.

To allow an election to be revoked if made on the basis of a mistake made with regard to one such factor would, at least in the circumstances presented here, involve undesirable speculation. For instance, on their 1963 return, the taxpayers claimed a deduction of $343.78 as an interest expense, wholly unrelated to the capitalized interest item here in controversy. The Commissioner subsequently disallowed the claimed $343.78 deduction "because it has not been established that the amount * * * was expended for the purpose designated." That determination has not been contested, and we cannot be certain what the taxpayers would have done with regard to their election if they had not claimed the interest deduction initially. To be sure, the amount of the disallowed deduction was comparatively small and it possibly would not have played too significant a part in the exercise of judgment as to whether the carrying charges on the unproductive real estate should be expensed or capitalized. Nevertheless, it is not difficult to imagine a closer case to demonstrate more clearly that it would be unwise to engage in any such speculative inquiry.

We conclude that *Meyer's Estate* is inapposite,[10] and that this case is governed by *Pacific National Co.* v. *Welch, supra*, and its progeny. The taxpayers' original election to capitalize tax and interest payments may not be revoked. Cf. *Kehoe-Berge Coal Co.* v. *Commissioner*,

---

[10] Petitioners rely also on *Gentsch* v. *Goodyear Tire & Rubber Co.*, 151 F. 2d 997 (C.A. 6), in support of their argument that the taxpayers' election herein should be permitted to be revoked. We consider that case to be of little relevance herein, particularly because it did not involve a statute authorizing an "election." 151 F. 2d at 1000.

117 F. 2d 439, 40 (C.A. 3); *National Western Life Ins. Co.*, 54 T.C. 33, 38–40.

Reviewed by the Court.

*Decision will be entered for the respondent.*

WITHEY, *J.*, dissenting: I agree with the majority that *Meyer's Estate* v. *Commissioner*, 200 F. 2d 592 (C.A. 5), reversing 15 T.C. 850, is distinguishable from this case. However, I do not think that the distinguishing factors are those which will affect the decision of the Court of Appeals for the Fifth Circuit should this case be appealed thereto. Regardless of whether or not taxpayer's mistake here was a material mistake of fact, it seems to me that court will decide that it was a material mistake of fact, and there being no regulatory prohibition in this case against a late election, as there was in *Meyer*, in my opinion the Fifth Circuit on appeal would find no difficulty in permitting this taxpayer to change his election. For that reason we are bound by *Jack E. Golsen*, 54 T.C. 742, and should therefore decide the case for the taxpayer to avoid an unnecessary appeal.